EreemaN, J.,
delivered the' opinion of the Court.
This bill is filed by complainants, the three first of whom composed the Quorum Court of.White pounty at the time, and other citizens of said county, to restrain by injunction the defendants from organizing as a Board of Commissioners, or Commissioners’ Court, for the County of White, and to have a law that was passed by the Legislature on the 12th of March, 1868, entitled “An act to create a Board of Commissioners for the county of Madison,” the provisions of which were extended, by the 15th section of said act, to the county of W"hite, .declared unconstitutional, and then to perpetually ..enjoin the Commissioners appointed from acting as such Board under said act.
This act, it. is insisted, is in violation of the Constitution of Tennessee, and a number of grounds are assigned in the bill upon which its validity is attacked. It has *684 been argued with great zeal and marked ability by counsel on both sides; and as it is a question on which there has been difference of opinion, and which has given rise to much feeling and angry discussion, we propose to examine it as fully as the facilities at hand for such investigation will permit, and will endeavor to place our conclusions on the basis of sound reason, principle and authority.
Without at present citing the various provisions of this act of the ■ legislature of our State, we may assume that it proposes to supplant and abolish that ancient institution of the State, known as the Quarterly Court, and place in its stead a Board of three commissioners, appointed by the Governor, conferring upon the Commissioners the powers of the Quarterly Courts, together with some additional powers, perhaps not possessed by said court under the laws in existence at the time of the passage of this act by the legislature.
The first question presented for our consideration is, whether the legislature had the constitutional power to do this? And the next is, whether it could be done in the mode attempted; that is, by an exceptional enactment, applicable to one or more counties, and not by a general law, applicable alike to all the counties of the State, or operating equally and alike over the whole territory of Tennessee — in other words, is this the law of the land, within the meaning of the Constitution?
On the first question, there is some difficulty in arriving at a satisfactory conclusion. The County Court, or Quarterly Court, or Court of Pleas and Quarter Sessions, was part and parcel of the organized machinery of our State government at the adoption of the Constitution of *685 1834, and bad been of the State of North Carolina before the adoption and formation of our original Constitution of government of 1796. By the Constitution of 1796, article 6, it is provided: “There shall be appointed in each county, by the County Court, one Sheriff, one Coroner, one Trustee, and a sufficient number of Constables, who shall hold their offices for two years. They shall also have power to appoint one Register and one Ranger for the county, who shall hold their offices during good behavior.” By article 5, sec. 12, it is provided, that “Jus- ' tices of the Peace shall be appointed for each county;” and their number was limited to two for each captain’s company, except for the company that includes the county town, and in this they should not exceed three. Yet we find in this Constitution no provision establishing such a court. It is simply recognized and treated as one of the existing institutions of the State, well known, and there-. fore referred to simply as the “County Court.”
This institution continued among us down to the time of the formation of the Constitution of 1834; and so far as we can learn from the history of that period, no complaint had ever been made of it — no wish had been expressed by any one to get clear of it, or to alter or abolish the system of arrangements of which it was a part, nor to substitute anything in its stead. We can not learn that the convention of 1834 had any purpose to abolish it, or had any proposition submitted to it, looking to such an end. We may safely affirm that, if such proposition had been presented, it would have been promptly rejected. That convention had in it much of the best- talent of the State, and lawyers whose learning *686 and thorough acquaintance with the machinery of our State government, has not been excelled by any. who have lived in the State. =■ • -
In arriving at a .correct conclusion asto what the Constitution, intended to establish, and what. to . abolish,; or its true intent and meaning on questions ■ such as are involved in this case, in the language of Judge Denio, in delivering the opinion of a majority of the .Court of Appeals in the case of The People v. Draper, 15 N. Y. Rep., 537, “we must keep in ‘ mind that . the Constitution was not framed for a people entering into a political society for the first time, but for a community already organized and furnished with legal and political institutions adapted to all, or nearly all, the purposes of civil government, and that it was not intended to abolish these institutions, except so far as they were repugnant to the Constitution then framed.”
~Wq may assume the proposition to be a correct one, that the intent and meaning of the Constitution, when arrived at in accordance with established principles of construction, is the supreme law of the land to our legislature, and that the legislature has plenary legislative — _ that is, the law-making power — except in so far as they are restrained by the Constitution of the State, or of the. United States. The prohibition to exercise a particular power, or make a particular enactment, need not be expressed however, but may be implied. And that such an implication would fairly arise when ■ we can see from the Constitution that certain arrangements. therein provided for, or certain institutions, or parts of the existent organization of the State, are referred to as being the *687 agencies charged with the performance of certain duties' by the terms of that instrument, and 'that the existence of these agencies was contemplated as continuing, and was thus, however remotely recognized by the Constitution,' that such reference would' amount to a "fairly implied constitutional establishment of, or at any rate, recognition of, and continuance of, such existing' agencies or" organizations.
Now, we look at the fact that, by the Constitution" of 1796, article 6, ■ referred to above, the County' Court is chargeable with the election of certain officers, yet we find no other notice of its organization or establishment in that instrument. We find, however, that as then recognized, it continued in existence as part of the machinery' of that well-known, settled, ánd established -political and civil division of our state government, 'the county," up tb the adoption of the Constitution of 1834, and conclude that if such an innovation as the destruction'óf the County Court had been contemplated, or if authority had been ‘conferred on the Legislature to make such change, it would have been plainly conferred by express provision. ‘
But without insisting on this view, as eonclúsive, we may safely and surely look 'at the Constitution' itself, and see in the light of the facts existent at the time of its adoption, whether or not in that instrument there is by fair inference a recognition of the existence' and' intended perpetuation of the Quarterly or County Court. If so, the Legislature can not abolish it and supplant- it by othér agencies, differently constituted, though charged with the same duties and given the same powers. '
It is provided by article 6, sec. 15, of the Constitution, *688 that the counties of the State shall be laid off into districts of convenient size, so that the whole number in each county shall not be more than twenty-five; and that there shall be two Justices of the Peace elected for each district, including county towns, which shall elect three, etc.
In article 7, sec. 1, it is provided among other things, “There shall be elected for each county, by the Justices of the Peace, one Coroner and one Ranger, who shall hold their offices for two years.”
By sec. 2 of said article, “should any vacancy occur subsequent to an election in the office of Sheriff, Trustee or Register, it shall be filled by the Justices,” etc.
It will be seen that the same officers are here to be elected by the “Justices of the Peace” — that is, the Coroner and Ranger; and, in case of vacancy, of Sheriff, Trustee and Register, that were by the Constitution of 1796, art. 6, directed to be appointed by the “County Court.” It is true that the Sheriff and County Trustee, who were to be appointed by the County Court by said 6th article, are to be elected by the provision of the 7th article, sec. 1, of the Constitution of 1834, by the people, except in case of vacancy. Yet, we do not see how any one can take the two articles together, and the facts existent at the time of the adoption of the Constitution of 1834; and not conclude that the only change intended to be made by the Convention in article 6, sec. 1, of 1796, was, that the Sheriff and Trustee should be elected by the people, but the Rangers and Coroners were to continue to be elected by the Justices of the Peace — that is, by the County or Quarterly Court, assembled as has been their wont from the foundation of the State; that by “Justices of the *689 Peace,” in article 7, sec. 1, of the Constitution of 1834, was meant precisely the same thing as “County Court,” in article 6, of the Constitution of 1796.
This view of the case is strengthened by the fact that there is no provision for their special assemblage for the purpose of performing the duty with which they are here charged in the election of these officers; and it certainly was not contemplated that their election was to be by the Justices, each voting or choosing in his separate district, without concert with his co-Justices of the same county.
Contemporary construction, as given by the action of the Legislature, and of the people or Justices in the election of their officers after the adoption of the Constitution, strengthen and confirm this view of the case. We find in the compilation of our statutes, made under the direction of the Legislature in 1836, immediately after the Constitution went into effect, that the act of 1829, c. 37, is continued. That act provides, “it shall be the duty of the several County Courts in this State, at any time when a vacancy shall happen, to elect one Ranger,” etc.; and at the head of the chapter — Constitution of 1834, art. 7, sec. 1 — is referred to for the constitutional provision giving the authority for the election: See Car. & Nic., p. 560. As to Coroners, the act of 1785, e. 3, was continued in said compilation, “that each Coroner shall, before the Justices in court, enter into bond,” etc., sec. 6; See Car. & Nich., p. 186, and under the title “County Court,” will be [found the act of 1817, c. 48, s. 8, providing that “all elections for Rangers and Coroners shall take place on the second days of the Term, as formerly, on which *690 day it shall be the duty of all the acting Justices of the Peace of the county to attend for that purpose.”
In these various provisions are certainly contained a clear and unequivocal contemporary view of the provisions of the Constitution of 1834, recognizing; as one of the constitutionally continuing institutions, existent at the time of its adoption; the assemblage of the Justices of the Peace, in County Courts, charged with the election of the officers above referred to, and as a matter of course, with other duties appertaining to and annexed by law to their assembled organization, known as the County Court. In other words, the Legislature that assembled immediately after the adoption of the Constitution of 1834, construed that instrument as perpetuating what was known before as the County Court; and, as recognizing that certain duties were imposed on said body by the Constitution, which necessarily implied and demanded its continued existence. Mr. Cooly, in his admirable work on Constitutional Limitations, page 67, lays down the following sound principles applicable to this question: “Contemporaneous construction may consist simply in the understanding with which the people received it at the time, or in the acts done under it in operation, and which necessarily assume that it is to be construed in a particular way. In the first case, it can have very little force, because the evidence of the public understanding, when nothing has been done under the provision in question, must always be necessarily vague and indecisive. But when there has been a practical con *691 struction, which has been acquiesced in for a considerable period, considerations of adhering to this construction present themselves to the courts, with a plausibility and force which is not easy to resist. Indeed, when a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had an opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention.”
From this view of the case, we are led to the conclusion that the Constitution in the articles cited, looked to the continued existence of this assemblage of the Justices of the Peace of the county for the performance of the duties therein imposed, and that it was recognized as an assemblage representing the corporate existence of that constitutional division of our State known as a county; and that this institution, in this aspect of it, must continue until abrogated by the action of the people in changing the constitutional provisions referred to.
There are other provisions of the Constitution that we think might probably be referred to as bearing on the question; such as the provisions of art. 2, see. 29, giving the Legislature power to authorize counties and incorporated towns in this State to impose taxes for county and corporation purposes, etc. — involving the idea of the action of a county as a corporate body, and, as such, being represented by a body of men answering to the corporators, or representing the body *692 upon which the duty is imposed, or to whom the privilege was granted. We have but little doubt that in these provisions it was understood that the county as a corporation, or quasi corporation, was to be represented by the Justices in County ' Court assembled. In addition to the recognition by the Legislature that adopted the revisal of our laws made by Messrs. Nicholson & Caruthers, as shown in reference to the election of the offioers herein referred to, it will be seen that the various acts of previous Legislatures, fixing the duties of the County Court in reference to the local administration of the affairs of the county, are continued in force — such as the act of 1827, c. 49, s. 14, authorizing the County Court to appropriate money for the payment of jurors, the costs of criminal prosecutions, to solicitors, to Sheriffs and Clerks, for ex officio services, and making out tax lists, for repairing and taking care of court-houses and public buildings, jails and bridges.
By s. 15 of said act, “Where the County Court shall make an appropriation, not- exceeding $50, one-third or twelve of the members shall be present, whose names shall be incorporated in the order;” and then it is provided, that in all appropriations hereafter to be made by any of said courts, the vote shall be taken on the same by ayes and nays, the Clerk calling and recording the name of each Justice, together with his vote, and entering his vote as given on the minutes, etc. It will be seen here that the body is understood to have been continued in existence after the Constitution of 1834, and that from these provisions, *693 in all matters involving taxation of the county, it is treated as the quasi legislature of the county; and the principle of responsibility for their action to the people of the county, whose money they should appropriate, is carried out by the same means that fixes such responsibility on the members of our Legislature — that is, a vote by ayes and nays, recorded on the minutes of the court, so that the people, the constituency, of these Justices in county court assembled, could see from the record of their proceedings, who had voted for, and who against, each appropriation of their moneys, and hold them responsible if the appropriation was not a proper one.
It is true that the act of 1835, c. 6, was passed establishing a court in each county, to be held by the Justices of the Peace, on the first Monday in every month, one-third or twelve of the Justices of the county to be a quorum — three of the said Justices having power to take probate of wills, grant letters of administration, etc. We think this act was probably passed to organize this particular court, as a court under s. 3 of art. 6 of the Constitution of 1834 — providing that “courts may be established to be holden by Justices of the Peace,” yet this in no wise interferes with, or contravenes the idea that the quarterly assembly of the Justices, known as the County Court, with peculiar powers and duties, with reference to the local interests of the county, is not to be superseded, and was not so intended or understood ato have been intended at that time, by the provisions of the Constitution of 1834.
These various provisions- are substantially transferred *694 to the Code of Tennessee enacted by the Legislature in 1858.
We conclude from this review; inasmuch as Justices of the Peace are constitutional officers, and their functions as such well known at the time of the adoption of the Constitution of 1834, and as by art. 7, ss. 1, 2, taken in connection with the established order of things at the time, and contemporaneous construction by the Legislature of 1835 and 1836, together with the uniform understanding of all departments of the government from 1834 to the passage of the acts, or class of acts in question, the assemblage of the Quarterly or County Court of each county, as the quasi representatives of the counties, as corporate or quasi corporate communities, is, as we think, most clearly recognized and necessary for the performance of the duties imposed in the Constitution; that no Legislature of Tennessee, or any body short of a constitutional Convention, can change or alter or abolish this established order of things. This having been attempted in this case, and the law having no other purpose, if this purpose fails, the whole law must be treated as a nullity and declared void.
We do not mean in this opinion, to adjudge or decide anything upon the question of the organization of special courts, or of tribunals of any kind in counties, such as special criminal courts, but to confine this opinion to the simple question of the power of the Legislature to overturn the local government, so to speak, of a county, displace the assemblage of the recognized organization representing the county, to whom duties are assigned by *695 the Constitution, and place in its stead other organizations, unknown to our past history up to the passage of the law of which the act of 1868 is a part, and never contemplated by the Constitution, nor purposed or provided for in that instrument.
The next view of this question, is, whether this law, and the others of its class, is the “law of the land,” under sec. 8, art. 1, of the declaration of rights under the Constitution, or a general law under art. 11, sec. 7, of the Constitution.
The first article referred to is, “That no freeman shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land.”
Art. 11, sec. 7, is, “The Legislature shall have no power to suspend any general law for the benefit of any particular individual; nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals rights, privileges, immunities, or exemptions, other than such as may be, by the same law, extended to any member of the community who may be able to bring himself within the provisions of such law; provided, always, the Legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good.”
We turn to the leading provisions of the law in question, and see what is proposed to be done by it, in order to ascertain whether it comes within and is *696 obnoxious to these great fundamental provisions of our Constitution. If so, it deserves, and must receive, our prompt and unqualified disapprobation, and be declared by us, in discharge of our constitutional function, absolutely void.
By the 1st section it is provided, in substance, that “there shall be established for the county of Madison, (and by the 15th section the general provisions of the law are extended to White, and by different sections to other counties,) a Board of Commissioners, to serve three years, who shall have resided in the county one year, each to serve for three years, and until their successors are elected and qualified, except in cases of appointment as hereinafter provided. That one of the Commissioners is to be elected by the qualified voters of the county on the 'first Saturday of March of each year; the first election to take place in 1869, and annually thereafter. Until such election takes place, the said Commissioners shall be appointed by the Governor of the State, who shall designate in the Commission to be issued to each of said Board, the period at which their terms shall successively expire, etc.; the last named, that is the one whose commission is to expire in 1871, to be the President of said Board, till the term of his office as Commissioner expires; after which each member, of said Board shall be President thereof from the commencement until the close of the last year of the term of his service. By section 2, in case of vacancy by death, resignation or removal of any one of said Commissioners, his place shall be filled by appointment by the Board, until the next annual *697 election by the people. By section 3 it is provided that the Commissioners shall give bond. and sureties in the sum of 12,000, and take an oath of office, such as is required to be taken by other county officers. By section 4, this Board is to hold four sessions annually at the county seat, at the times now prescribed by law for the holding of the regular Quarterly Courts of these counties. The Clerk of the County Court shall be Recorder of said Board and perform the duties now required to be performed by him as Clerk of said Quarterly Court. By section, 5 “all powers and duties which are now vested in, and performed by the Quarterly Court of said county, shall be vested in said Board of Commissioners; and in addition to the powers now conferred by law, the said Board shall have authority to insure the public buildings and other property of the county; to order and contract for surveys and maps of the county; to provide for payment of expenses and furnishing court rooms; to establish grades; to purchase record books, all necessary stationery for their own use as a board, and for clerk’s offices and other courts in the county; to provide for the compensation and expense of jurors as fixed by law; to appoint an attorney for the county, whose duty it shall be to prosecute and defend all suits in behalf of the county, to advise the commissioners on legal questions, to inspect and examine all bonds of other officers of the county, to prepare blanks to be used by said commissioners, and other necessary matters within the sphere of his duties, which may be required of him by said board; to appropriate money for their own salaries and *698 tbe salaries of other county officers; to subscribe stock in railroads, which the county of Madison had been authorized by general or special law to subscribe, and to represent such stock in all elections for directors, and to provide for payment of subscriptions as made. No money shall be drawn from the treasury, except upon a warrant by the President of said Board, countersigned by the Clerk of the County Court; and the said Commissioners are hereby vested thus with all the powers heretofore vested in the County Courts by sections 4206, 4207 and 4211 to 4215.
By section 6, the magistrates of said county shall be, and are hereby, relieved from all further duties and obligations incidental to their office as members of the Quarterly Court of said county.
The compensation for the President of the Board is fixed at $500, and the others at $400, payable out of the County Treasury.
The first thing that strikes us on looking at this strange enactment of the Legislature, is its startling novelty, as compared with anything that ever existed under our Constitution from the organization of the State to the date of the act. In the second place, we remark that all the presumptions arising from a past history of about seventy years, without ever having been once suggested by any legislative body, rise up against the idea that such an organization or body, was ever contemplated by our fathers, who made the Constitution under which this act was passed.
That taxation and representation necessarily go together, was and should be an axiom in our govern *699 ment; and if there is any matter upon which we can say that our people were sensitive at tbe adoption of our Constitution, above all others, it was tbe question bow, and by what power, the taxes they were to pay should be imposed; and that a strict responsibility should attach to those who did impose them. Our own Supreme Court has held that taxation and representation must go together, and the opposite is tyranny —and therefore held that to tax a Cherokee, resident within the limits of the State, without at the same time extending to him the rights of citizenship, would be to practice the same despotic power against which our ancestors rebelled: State v. Ross, 7 Yer., 74. In the case of Marr v. Enloe, 1 Yer., 452, this principle is asserted in reference to the right of taxation delegated by the act of 1827, c. 49, s, 1, to the County Courts to fix at discretion the amount of tax to be levied.
It is well said by the Court of Appeals of New York, in the ease of the People v. The Mayor, etc., of Brooklyn, 4 N. Y. Reports, 426, that this “vital power, that of taxation, may be abused, but the interest, wisdom and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.” Chief Justice Marshall, in the case of McCullock v. Maryland, 4 Wheaton, 428, said “The only security against the abuse of this power is found in the structure of our Government itself. In imposing- a tax the Government acts upon its constituents,” and we add in his own language *700 that the theory of our Government assumes, “that the influence of the constituents over their representatives to guard them against the abuse,” is a principle that can never be departed from without vitally affecting the rights of liberty and property of the people. Whoever has the power to impose a tax upon another, has to that extent the right to take the proceeds of his labor for the public use, or in payment of that tax. One of the most prominent features of a state of slavery, is, that the labor of one man, and its proceeds, may be taken and applied to the use of another, without his consent. So that we can see that the power of taxation, whenever exercised without consent, and without clearly defined limitations, has in it, in fact, one of the harshest features of tyranny, as well as one of the most essential elements of a state of slavery.
It will be seen that all the powers of taxation for county purposes, formerly exercised by the Quarterly Courts, who were elected by the people and responsible to them — who occupied the position of representative in fact, practically, though perhaps not in theory, is by these enactments transferred to these Commissioners, and they appointed by the Governor of the State — it is true, after a while to be elected by the people — but the defendants to this bill hold the tenure of their offices by virtue alone of the will of the Governor of the State.
Can it be believed for a moment, that the power was ever intended to be delegated by the people to the Legislature to authorize such a body, so appointed *701 and constituted, to perform the functions assigned to them in this act? We think no reasonable man can come to such a conclusion.
Another view of this question: Here is a power to take from the people their property by taxation, by which they may be destroyed, or burdened with burdens too grievous to be borne; and that by a special enactment, applicable only to a few counties, which are either made the special recipients of this favor by the Legislature, or the special objects for imposition of these burdens, as it may happen to be viewed. This is not, then, upon sound principle, in any sense, a law of the land; and yet it — by and through the agencies put in operation by it — deprives the people of their property at the will of men appointed by ■ the Governor of the State. We think this view of the question conclusive as to the unconstitutionality of this law; and .upon this last ground, would be bound to hold it not a “law of the land,” and therefore of no validity. The clause, “law of the land,” in our Constitution, imports a general public law, equally binding upon every member of the community: Vanzant v. Waddell, 2 Yer., 260; Wally’s Heirs v. Kennedy, 2 Yer., 554.
We add in conclusion, that the very idea of law is exclusive of, and forbids such exceptional legislation —that is, “a rule of action prescribed by the supreme power in the State.” This involves the idea, not of local regulation, upon matters of general interest at least, but of a general rule, alike applicable to all the State. We are aware that there may be excep *702 tions to this rule, but this is not one of them. We can see clearly that the evils intended to be guarded against by requiring laws to be general and operative upon all the .«people or parts of the State alike, are to be found in this case ' as well as any other. One reason that underlies and is the basis of objection to all exceptional legislation in a country like ours, is, that the principle of responsibility of the representative of the people, to that people, for the correctness of his conduct, as a legislator, is a fundamental one, and furnishes in most cases, the only check upon his conduct. If all laws are required, as the general rule, to be operative upon all the people of the State, each representative is compelled to take the responsibility by any legislation in which he may concur, of fixing its burdens, if any be imposed, upon his own constituency, as well as that of the other parts of the State. He thereby is compelled to assume the responsibility for the propriety of the law passed by the body of which he is a member. If the contrary character of legislation may be allowed, then he may and will be willing to fix burdens on others, to whom he is not responsible, and we have no responsibility imposed upon him, as the result of his action, to the people whose representative he is, in the legislative assembly of the State.
We can see how members of the Legislature may be willing to oblige partisans or designing men, by organizing Boards of Commissioners for other counties, who would not dare to vote for such a measure if it was general and operative alike upon their own constituency *703 or tbe people or tbe whole State, instead of spending its force upon the interests of one or more obnoxious counties, or upon a community with whom the larger portion of the members of the Legislature had no connection, and to whom they feel no' sense of responsibility, and to whom they are not personally accountable for their conduct.
We hold, then, that a lav/ of this character, which proposes to break up the established order of things in the ancient organized machinery of the State, should, if allowable at all, be a general law, operative alike upon all parts of 'the State, in order that the people may be guarded from hasty and ruinous legislation, by a sense of wholesome responsibility, imposed upon the representative, to that people upon whom the laws enacted must be operative. This is essential to guard the weak from oppression on the part of the strong, and give all an equal measure of justice, of benefit and advantage from the laws, and to secure an equality necessary to the public good in the burdens and impositions that may be fixed upon the people by the legislature.
We will not countenance any departure from this great and vital principle, unless it be clearly authorized by the Constitution of our country; and we do not think the laws now under discussion present any considerations that will authorize a liberal construction of the Constitution in their favor. Feeling assured that all exceptional legislation of this character is evil in its tendency, we can safely declare it in violation of the constitution, and strike it down with the certainty that no *704 great public or private interest will, in the least, be injuriously affected by such decision.
The question has now ceased to be a practical one, as all the legislation of this character, complained of in this bill, has been swept away by a Legislature that has been guided by a feeling of deeper reverence for the past, and a more thorough recognition of the long established usages and customs of the people whom they represented.
It has been earnestly pressed on us that as a co-ordinate department of the government, we should approach with great tenderness a conclusion that the Legislature had violated the Constitution by any of its enactments. On this question we may make one remark, that whatever is constitutionally enacted by the Legislature, is binding upon us as a court, and we shall firmly and fairly enforce it as the law of the land. Yet we shall with equal firmness, and without any feeling of hesitancy on our part, declare any enactment a nullity, and binding on no one, that violates either the Constitution of the United States or of our own State. This high duty is imposed on us by the position which we occupy, and we shall not at any time, shrink from its performance, or hesitate for a moment in announcing our decisions upon such questions. We know that in these constitutions are embodied the guaranties for life, liberty and property, won ' from power in all ages past by brave and true men — patriots and lovers of freedom — and if sternly and truly enforced by an enlightened and fearless judiciary, the liberties of our people are safe from all things but the strong hand of military power, or despotism, backed and sustained by such power. . Against power thus sup *705 ported, tbe judiciary is powerless; but when such power shall grow formidable enough in a republic to be put in motion against the liberties of the people, the days of constitutional freedom will already have been numbered, and an independent judiciary be unknown — a constitution, with its limitations upon power, be but a name, a shadow, the substance and reality having passed away.
The decree of the Chancellor is reversed; the injunction granted made perpetual, and the defendants will pay the costs of the court below and of this court.

 this term, on the 1st day of March, on an indictment, under the Code, 4819, against James Peacock, for taking upon himself to exercise and officiate in the office of President of the Board of Commissioners of the county of Sumner, it was said that, in this case it had been held “that the statute creating the office of Commissioners is unconstitutional and void, and consequently the offense charged does not come within the provisions of the Code.” Per Ífensoír, J.
It has also been held, in the case of Shelby County v. Butterworth, Jackson, June 27, 1871, that county warrants issued by the President of the Board of Commissioners for Shelby county, were void, whether in the hands of the first taker or of an indorsee.