State, *ex rel.*, *v* Cummins.

STATE, *ex rel.*, *v.* CUMMINS.

(*Knoxville.* November 17, 1897.)

1. SHERIFF. *Entitled to control of jail.*

The provisions of Acts 1891, Ch. 123, Secs. 10, 11, requiring the Sheriff or Jailer of a county whose jail has been declared a workhouse, to deliver up the jail and "all prisoners" therein to a Superintendent elected by a Board of Commissioners created by the County Court, is void so far as it undertakes to deprive the Sheriff of the custody of prisoners who have been committed for safe-keeping, or who are under sentence of death, or who are awaiting trial, or transfer to State prison, or detained merely as witnesses, etc., as depriving the Sheriff, who is a constitutional officer, of a substantial part of his rightful jurisdiction, functions, and powers, notwithstanding the further provision of the Act allowing him to become such Superintendent, but subject to regulation and dismissal by the Commissioners. (*Post, pp. 668–682.*)

Constitution construed: Art. 7, Secs. 1, 2.

Act construed: Acts 1891, Ch. 123, Secs. 10, 11.

Code construed: §§ 449, 7370, 7375, 7390–7396 (S.); §§ 415, 6237, 6242, 6256–6263 (M. & V.); §§ 360, 5395, 5400, 5410–5417 (T. & S.).

Cases cited and approved: Pope *v.* Phifer, 3 Heis., 682; Shelby County *v.* Butterworth, *Ib.*, 705; Felts *v.* Memphis, 2 Head, 650; 26 Wis., 412; 2 Denio, 272.

2. SAME. *Constitutional status.*

While the Court vindicates the constitutional jurisdiction, powers, etc., of the Sheriff's office against such legislative encroachment as would clearly prove destructive of that office, it is careful to reaffirm the power of the Legislature, within reasonable limits, to regulate the fees and management of the office. (*Post, pp. 682, 683.*)

3. STATUTES. *Unconstitutional in part.*

Although Acts 1891, Ch. 123, Secs. 10, 11, is unconstitutional in that feature which undertakes to trench upon the jurisdiction,

powers, etc., of the Sheriff's office, the act is not thereby invalidated in other respects. (*Post, p. 682.*)

FROM HAMBLEN.

Appeal from Chancery Court of Hamblen County. HUGH G. KYLE, Ch.

J. A. CARRIGAR, and WASHBURN, PICKLE & TURNER, for Relator Hays.

ROSE & HICKEY for Cummins.

MCALISTER, J. This bill was filed in the Chancery Court of Hamblen County, for the purpose of testing the constitutionality of the Workhouse Act of 1891. Complainant is the Sheriff of Hamblen County, and is seeking, by mandamus, to compel the Workhouse Commissioners of said county to reinvest him with the custody of the jail and the county prisoners. The bill alleges that, under the provisions of the Act of 1891, Ch. 123, complainant has been deprived of the custody of the county jail, and that said jail and the prisoners confined therein have been committed, by said Workhouse Commissioners, to the charge of the defendant, Rowland, as Superintendent. The defendants demurred to the alternative writ of mandamus, which was overruled, the Chancellor being of opinion that the workhouse law

State, *ex rel.*, *v.* Cummins.

is unconstitutional. On appeal the cause was assigned to the Court of Chancery Appeals, which reversed the decree of the Chancellor, sustained the demurrer, and dismissed the bill.

The Act in question is entitled—

"AN ACT to establish county workhouses; to provide for working misdemeanor and other convicts sentenced to such workhouse; to provide for Commissioners and a Superintendent, and other subordinates for workhouses, and to define their powers and duties.

"SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That the County Court of any county may, through its Quarterly Court, provide such lands, buildings, and articles of any kind as may be necessary for a workhouse for such county.

"SEC. 2. *Be it further enacted*, That any county not having provided a separate workhouse, may, through its Quarterly Court, declare its jail to be a workhouse, if such jail be, in the opinion of its Magistrates, of sufficient capacity and suitable for the purpose, and from and after such declaration the jail shall be known as, and shall be, the county workhouse, and such county shall have thereafter the benefit of all laws of the State applying to workhouses.

"SEC. 3. *Be it further enacted*, That when any county has established a separate workhouse, or the jail in any county has been declared a workhouse, the Quarterly Court thereof shall elect four competent persons, who, in conjunction with the Judge or

Chairman of said Court, shall be known as the Board of Workhouse Commissioners, of which the said Judge or Chairman shall be *ex officio* Chairman of the board. Two of said Commissioners shall serve for the term of one year, and two for the term of two years, and annually thereafter the said Quarterly Court shall keep said Commissioners elected by electing two Commissioners for the term of two years, and all vacancies shall be filled by like election for the unexpired term of the Commissioner whose place is to be supplied. Said Commissioners shall have charge, supervision, and control of the workhouse in all of its departments, the convicts, the appointment or selection of a Superintendent of the workhouse, all necessary guards and other employes, the discharging thereof at any time, in the discretion of the Commissioners, and generally to regulate and to control that department of the county's business.

.    .    .    .    .    .    .    .    .    .    .

"SEC. 7. *Be it further enacted*, That the Board of Commissioners, when any county has established a separate workhouse, or which has declared its jail to be a workhouse, shall appoint a Superintendent of said workhouse; said Superintendent, when first appointed, shall hold his office for the remainder of the year; thereafter the Superintendent shall be appointed on the first Monday in January, and hold his office for two years, unless sooner suspended or removed, as provided in Section 3; *Provided*, That where any county now has a Superintendent in charge

State, *ex rel.*, *v.'* Cummins.

of its workhouse he shall hold over until the first Monday in January, 1892. The Superintendent appointed under this Act shall take an oath and give bond for the faithful discharge of his duty, with two or more approved sureties, in the sum of $1,000, payable to the State of Tennessee for the use of the county, before the County Judge or Chairman, which oath and bond shall be filed with the County Court Clerk, and record made on the minutes of the Court. His salary shall be. fixed by the Commissioners, which shall be paid quarterly on the warrant of the Judge or Chairman of the County Court.

"SEC. 8. *Be it further enacted*, That it shall be the duty of the Superintendent to discharge each prisoner as soon as his or her time is out, or upon order of the Board of Commissioners; to see that the prisoners are properly guarded to prevent escape; that they are kindly and humanely treated, and properly provided with clothing, wholesome food properly cooked and prepared for eating three times a day when at work; that they are warmly and comfortably housed at night and in bad weather; when sick, that they have proper medicine and medical treatment, and, in case of death, be decently buried. He shall keep the males from the females, and the blacks from the whites, except when at work the whites may be worked with the blacks.

"SEC. 10. *Be it further enacted*, That the Sher-

iff or Jailer of the county whose jail has been declared a workhouse, shall deliver up the jail to said Superintendent, and all prisoners therein, provided the Sheriff of any county shall have the right to the place of Superintendent himself, but not by deputy. If he elect to hold the place, he shall notify the Judge or Chairman of the County Court, in writing, on or before the day fixed in this Act for the appointment of a Superintendent. In such case he shall remain in charge of the prison, but shall be subject at all times to the orders of the Court and Commissioners; his salary shall be fixed by the Commissioners; he shall be subject to dismissal by them, and shall have the powers and perform the same duties as any other Superintendent under this Act, it being the object and purpose of this Act to abolish the jail system in such counties as may avail themselves of it and establish the workhouse system instead.

"Sec. 11. *Be it further enacted*, That, after the jail of any county has been declared a workhouse, all persons liable to imprisonment for safe-keeping, whether charged with felonies or misdemeanors, shall be confined therein, and be under the control of Workhouse Commissioners and Superintendent. All such persons shall be securely kept and properly cared for. The State shall pay for the board of State's prisoners the amount necessary, but shall not exceed the amount now allowed by law. The bills for the same shall be made out each month and

sworn to by the Superintendent, and shall be approved by the Judge of the Circuit and Criminal Courts, and certified by the Clerk, as now required by law. The amount of these bills from the State shall be paid to the ⟨Superintendent, who shall pay the same to the County Trustee, on receivable warrant of the Judge or Chairman of the County Court, keep a record of the same in his account book, and show the amount in his report to the Commissioners.

"SEC. 12. *Be it further enacted,* That in all cases where a person is by law liable to be imprisoned in the county jail for punishment, or by failure to pay a fine and costs, or costs only, as the case may be, in misdemeanor cases, and in felony cases where the punishment has been commuted from the confinement in the penitentiary to the county jail, he or she shall be sentenced to be confined and shall be confined at hard labor in the county workhouse until the expiration of their sentence of imprisonment, and thereafter until the fine and costs, or costs only, as the case may be, have been worked out, paid, or secured to be paid. All such fines and costs shall be paid to the County Trustee upon receivable warrant of the Judge or Chairman of the Court when paid by the prisoner or his sureties."

The sections above quoted sufficiently indicate the object and scope of the Act without setting out the remaining sections, which are unimportant in the present investigation.

15 P—43

The first assignment of error made in behalf of the Sheriff is, viz.:

1. The Sheriff is a constitutional officer, recognized by the Constitution, Art. 7, Secs. 1 and 2, and the Legislature has no power to deprive such an officer of any substantial part of his jurisdiction, rights, and authority, which existed at the time the Constitution was adopted. From time immemorial the jail has, of right, belonged to the office of Sheriff. It was so in Tennessee at the adoption of all the constitutions. The Act of 1891, Ch. 123, attempts to take from him this right, and is void. Counsel cite: Act 1891, Ch. 123, Secs. 10, 11; *Pope* v. *Phifer*, 3 Heis., 682; *Shelby County* v. *Butterworth, Ib.*, 705, and note; *State, ex rel.*, v. *Brunst*, 26 Wis., 412 (S. C., 7 Am. Rep., 84); *King* v. *Hunter*, 65 N. C., 603; 6 Am. Rep., 754; *Warner* v. *People*, 2 Denio, 272; 43 Am. Dec., 740; *Commonwealth* v. *Gamble*, 62 Pa., 343; 1 Am. Rep., 422.

In the case of *Pope* v. *Phifer*, 3 Heis., 682, it was held "that the Quarterly Court, composed of the Justices of the several counties, was not provided for, in terms, by the Constitution of 1870, yet that it was referred to and treated as an existing institution, and that thus its status was fixed in the Constitution, and that a subsequent Act of the Legislature which undertook to vest all the powers and duties of that Court in a Board of Commis-

sioners, was an indirect way of abolishing the Court, and was unconstitutional."

In the *State, ex rel. Kennedy*, v. *Brunst*, 7 Am. Rep., 84 (26 Wis., 412), the Court said, viz.: "The office of Sheriff, in a certain sense, is a constitutional office; that is, the Constitution provides that the Sheriffs shall be chosen by the electors of the respective counties once in every two years, and as often as vacancies shall happen. Now, it is quite true that the Constitution nowhere defines what powers, rights, and duties shall attach or belong to the office of Sheriff. But there can be no doubt that the framers of the Constitution had reference to the office with those generally recognized legal duties and functions belonging to it in this country and in the territory when the Constitution was adopted. Among those duties, one of the most characteristic, well acknowledged, was the custody of the common jail and of the prisoners therein. . . It seems to us unreasonable to hold, under a Constitution which carefully provides for the election of Sheriffs, fixes the term of office, etc., that the Legislature might detach from the office its duties and functions and transfer those duties to another office. In this case it is said that the Legislature has attempted to take the largest share of the duties of the Sheriff in point of responsibility and emolument, and to commit it to an officer selected by the County Board of Supervisors. If the Legislature can do this, why may it not deprive the Sheriff of all the

duties and powers appertaining to his office, and transfer them to some officer not chosen by the electors ? "

In *Warner* v. *People*, 2 Denio, 272, a *quo warranto* was brought on relation of James Conner, Clerk of the city and county of New York, against Andrew Warner, for an intrusion into the office of the Clerk of the Court of Common Pleas for the city and county. The defendant pleaded the statute of April 10, 1843, and his appointment thereunder by the first and Associate Judges of that Court. Said the Chancellor: "The question presented for consideration in this case is whether the Act of April, 1843, which detached the clerkship of the Court of Common Pleas of the city and county of New York from the Clerk of the city and county elected by the people, and gave the appointment to three of the Judges of that Court, is not unconstitutional and void. The eighth section of the fourth article of the Constitution provides that Clerks of counties, including the Clerk of the city and county of New York, shall be chosen by the electors of the respective counties. And the next section requires Clerks of Courts, except those whose appointment is provided for by the eighth section, to be appointed by the Courts of which they are Clerks. Special provision is also made in the thirteenth section in relation to the clerkship of the Oyer and Terminer and General Sessions of the Peace of the city and county of New York, which clerkship, at the time

of the adoption of the Constitution, was a separate and distinct office from that of the Clerk of the city and county, which was then united with the clerkship of the Court of Common Pleas, as organized under the Act of 1821. . . . At the time of the adoption of the present Constitution the Clerk of the city and county of New York was the Clerk of the Court of Common Pleas, which had then been recently organized, and the greatest part of the emoluments of his office, at that time, must have been from that source. . . . The transferring of that clerkship, by this subsequent Act of legislation, to a new officer, to be appointed in a mode not authorized by the Constitution, was, in substance, a transferring to him of the office to which the relator had been elected for three years, and was taking from the electors of the city and county of New York the right to choose the officer who was intended to be designated, by the framers of the Constitution, by the name of the Clerk of the city and county of New York. If this can be done in relation to this office, I see nothing to prevent the Legislature 'from taking from the Clerks of other counties the duties of the Clerks of the Courts of Common Pleas and General Sessions, and the recording of deeds and mortgages, and appointing separate and distinct officers to discharge those duties, and by a mode of appointment which the framers of the Constitution never intended. . . . The fees and emoluments of office may

State, *ex rel.*, *v.* Cummins.

not only be reduced by direct legislation, but incidentally by the division of towns and counties, and the erection of new Courts, etc., as the public good from time to time requires. But when the Legislature, as in this case, assumès the power to take from a constitutional officer the substance of the office itself, and to transfer it to another who is to be appointed in a different manner, and to hold the office by a different tenure than that which was provided for by the Constitution, it is not a legitimate exercise of the right to regulate the duties or emoluments of the office, but an infringement upon the constitutional mode of appointment.''

In 1854 this Court, in the case of *Felts* v. *Memphis*, 2 Head, 650, speaking through the eminent jurist, Wright, said, viz.: ''At the common law, the custody of jails of right belonged, and was annexed, as an incident, to the office of Sheriff. The safe-keeping of prisoners involved much peril and responsibility, and it was esteemed unsafe to commit them to the care of any less a personage than the Sheriff himself, whose office was one of very ancient date, and of great trust and authority, and who might bring to his assistance the *posse comitatus* or power of the county. He had the appointment of the keepers of jails, and was to put in such for whom he would answer, for, being an immediate officer of the King's Courts, and amenable for escapes, and subject to amercements if he had not the bodies of prisoners in Court, it was esteemed against all

reason that another should have the keeping and custody of the jail. His right was favored, and could only be abridged by an Act of Parliament. Even the king's grant to another of the custody of prisoners was, after 5 H. 4, void. The care of gaols, cited in Milton's case, 460, 34*a*; 4 Bac. Ab. (Gaol and Gaoler, A), 29." See, also, Blackstone's Com., pp. 345, 346.

The Court of Chancery Appeals was of opinion, however, that the custody of the jail and its prisoners did not of right belong to the office of Sheriff at the adoption of the Constitution of 1870. In support of this position that Court cites certain provisions of the Code of 1858, viz.:

" § 360. *Duties.*—It is the Sheriff's duty:  .  .  .

"(3) To take charge and custody of the jail of his county, and of the prisoners therein; to receive those lawfully committed, and to keep them himself, or by his deputies or jailer, until discharged by law.

"(4) To perform such other duties as are, or may be, imposed by law."

" § 5395. The county jail is used as a prison for the safe-keeping and confinement of all persons committed thereto under the authority of law.

" § 5400. The Sheriff of the county has, except in cases otherwise provided by law, the custody and charge of the jail of his county, and of all prisoners committed thereto, and may appoint a jailer, for whose acts he is civilly responsible."

Sections 5410–5417 provide that the County Courts

and incorporated towns may establish workhouses, and appoint suitable persons for the management thereof; that there may be, in the discretion of the Court or Justice, committed thereto at hard labor all persons liable to be imprisoned in the county jail, whether for punishment after conviction, to pay fine and costs, for vagrancy, or merely for safe-keeping.

That Court was of opinion that the right reserved in said Act, Subsec. 4 of Sec. 360, to impose new duties, or other duties, is unlimited in extent, and is sufficiently broad to cover a different disposition of the jail and the prisoners in requiring the Sheriff to turn them over to some other officer that might be designated by law. The same reservation, says that Court, appears in other language, where it is said the Sheriff of the county shall have the custody and charge of the jail and of all prisoners committed thereto, "except in cases otherwise provided by law." Again, that Court thought the language in Sec. 3415, known as the House of Correction law, was sufficiently broad to cover all prisoners in the county jail.

Their conclusion upon these statutes, in the Code of 1858, was that the law in existence at the time the Constitution of 1870 was ratified, contemplated that a time might come in the history of the State when it would be to the public interest to take the prisoners from the custody of the Sheriff and confine them in the workhouse. But in answer to the argument of the Court of Chancery Appeals it may be said that the sections of the Code are open to the

State, *ex rel.*, *v.* Cummins.

same objections under the Constitution of 1834 now urged against the Act of 1891—to-wit: that is, they invaded a constitutional right of the Sheriff. If these provisions were void under the Constitution of 1834, they cannot be valid under the Constitution of 1870, for the guaranties in both constitutions were the same.

Nothing is to be presupposed as proved which itself requires demonstration. The violation of this rule furnishes the *petitio principii* of the logicians. See Sir William Hamilton.

It will be observed that Section 10 of the Act of 1891 provides that the Sheriff or Jailer of the county whose jail has been declared a workhouse, shall deliver up to the Superintendent elected by the Workhouse Commissioners, the jail and all prisoners therein. Section 11 further provides that, after the jail of any county has been declared a workhouse, all persons liable to imprisonment for safe-keeping, whether charged with felonies or misdemeanors, shall be confined therein, and be under control of Workhouse. Commissioners and Superintendent. It is true the Sheriff, under this Act, is given the option to become Superintendent, yet he is made subject to dismissal by the Commissioners at any time. The compensation is left to the discretion of the Commissioners, who, in this instance, fixed it so low, by farming out the contract to the lowest bidder, that the Sheriff was unwilling to undertake to feed and care for the prisoners upon such a niggardly allowance.

The Act, so far as it undertakes to establish a workhouse for the confinement and punishment at hard labor of all convicts who have been sentenced to that institution, is a valid and constitutional enactment. But we are constrained to hold that Sections 10 and 11, together with all other provisions of said 'Act, so far as they undertake to deprive the Sheriff of the custody of prisoners who have been committed for safe-keeping, or who are under sentence of death, or those awaiting trial or a transfer to the State prison, or for detention merely as witnesses, etc., are plainly destructive of the functions, duties, and prerogatives incident to the constitutional office of Sheriff, and are, therefore, to that extent void. This latter adjudication does not invalidate the balance of the Act, since the system devised by the Legislature for the establishment of county workhouses may be preserved and worked out without the aid of the features of the Act which we hold to be void. While the Sheriff is of right entitled to the custody of the jail for the safe-keeping of prisoners awaiting trial, transfer, or execution, etc., this will not prevent the County Court from declaring such jail a county workhouse for the confinement of prisoners who are under sentence therein, provided the jail is of sufficient capacity to accommodate both classes of prisoners, or may be made so by additions thereto.

While the jail is so jointly occupied, the workhouse prisoners will be under the control of the

State, *ex rel.*, *v.* Cummins.

Superintendent, who will provide for them as required in this Act, but all other prisoners will be committed to the care and custody of the Sheriff.

In reaching this conclusion we do not come in collision with the well recognized right of the Legislature to regulate the fees of the Sheriff and the management of his office. We simply hold that if the Legislature may take away from the Sheriff the control of the jail and the custody of prisoners, it may destroy the office; but it can do neither, for both are protected by the Constitution of the State.

The result is that the decree of the Court of Chancery Appeals is reversed, and the decree of the Chancellor, as modified herein, is affirmed; defendants will pay the costs.