State, *ex rel.*, *v.* Lindsay.

STATE, *ex rel.*, *v.* LINDSAY.·

(*Knoxville.* November 23, 1899.)

1. "JUDGES' ACTS." *Constitutionality and effect of.*

The judicial reform statutes of 1899, whereby certain chancery divisions and judicial circuits were abolished, and the jurisdiction and pending business of the Courts composing same were transferred to other existing divisions and circuits and the Judges thereof, are constitutional and valid; and said statutes had the effect to extinguish the abolished divisions and circuits, but not the Courts composing same, and removed the Chancellors and Judges thereof from office, depriving them of their right to future salary, and divesting them of all judicial functions, which are transferred to the Chancellors and Judges of the surviving divisions and circuits. (*Post, pp. 626–640.*)

Constitution construed: Art. II., Secs. 1, 2; Art. VI., Secs. 1, 4, 7.

Acts construed: Acts 1899, Chs. 212, 214.

Cases cited and approved: Coleman *v.* Campbell, 3 Shannon's Cases, 355; Halsey *v.* Gaines, 2 Lea, 316; State *v.* Thornton, 102 Tenn., 509; McCully *v.* State, 102 Tenn., 509.

Cited and distinguished: State *v.* Leonard, 86 Tenn., 485.

2. SAME. *Omission of county in general redistricting Act does not vitiate judicial reform statutes.*

The omission of a county from the general judicial redistricting Act, to go into effect in 1902, does not vitiate the judicial reform statutes of 1899 abolishing certain chancery divisions and judicial circuits and assigning the counties and Courts comprising same to other existing divisions and circuits. (*Post, pp. 643, 644.*)

3. CONSTITUTIONAL LAW. *Departments of government.*

The State Constitution creates distinct and independent departments of government, invests each with exclusive powers, and forbids any department to invade the province or assume the powers of another department. Hence, the Courts will not

19 P—40

State, *ex rel.*, *v.* Lindsay.

assume to keep the conscience or review the discretion of the Legislature, and thereby pass upon the wisdom, policy, expediency, or good faith of the action of that body in passing or refusing to pass statutes. If statutes violate no clause of the Constitution, the Courts have no power over their life. The Legislature is amenable to the people for its action in matters confided to its exclusive discretion. The ballot box, not the Courts, is the remedy for abuse of its powers in matters of this character. (*Post, pp. 640, 642–647.*)

FROM LOUDON.

Appeal from Chancery Court of Loudon County. JOHN P. SMITH, Ch.

ATTORNEY-GENERAL PICKLE for State.

LUCKY, SANFORD & FOWLER, GREEN & SHIELDS, TEMPLETON & CARLOCK, WELCKER & PARKER, WASHBURN & TURNER, WEBB & McCLUNG, YOUNG BROS., JOROULMON, WELCKER & HUDSON, *contra.*

WM. L. GRANBERY, Sp. J. The bills in these three separate causes were filed by the State, on the relation of citizens and taxpayers of Loudon County, against the defendants, to enjoin them from exercising the functions of their respective offices to which they had been elected at the last regular judicial election, but from which the Legislature, at its last session, by resolution, and by laws abolishing the chancery division and judicial

State, *ex rel.*, *v.* Lindsay.

circuit in which the defendants had been respectively elected, had removed them.

The three bills involve the same questions, with the exception of the first, which involves an additional question peculiar to itself, and for this reason the opinion will be filed in the first above-named case.

The case was heard by the Chancery Court, and the Acts and the resolution of the General Assembly above referred to were held unconstitutional and void. An appeal was taken to the Court of Chancery Appeals, which reversed the decree of the Chancellor, and the cases are now before this Court upon appeal.

The defendant, Lindsay, was regularly elected Chancellor of the Second Chancery Division of the State of Tennessee at the August election, 1894, and was duly commissioned and qualified as such. By Chap. 212 of the Acts of 1899, passed April 12 and approved April 13, 1899, the General Assembly, in terms, abolished the Second Chancery Division, and by Chap. 214 of the same Acts, passed the same day and approved three days later, the various Chancery Courts in the Second Chancery Division were divided between the First and Twelfth Chancery Divisions, and the Chancellors of these respective divisions were directed to hold the Chancery Courts in the counties assigned to their respective divisions at the times designated in the Act.

On April 21, 1899, the Legislature, by resolution adopted by the proper constitutional majority, removed the defendant "from the office of Judge of the Chancery Court of the Second Chancery Division" for economic causes, at the same time testifying and emphasizing in the resolution the eminent ability, fidelity, purity, and faithfulness of defendant in private and public life, thus showing that the removal was not for personal, but for economic reasons.

In Chap. 214 it is provided that this Act shall expire on the 1st day of September, 1902; and by Chap. 427, passed April 21 and approved April 22, a general redistricting Act was passed, to take effect the 1st of September, 1902.

In this general redistricting Act the County of Knox, one of the counties in the Second Chancery Division, was entirely omitted, thus leaving, after September, 1902, no provision for a Chancery Court in that county.

Notwithstanding these Acts and the resolution of the General Assembly, the defendant continued to assume to act as Chancellor of the Second Chancery Division, and to hold the respective Courts assigned to that division, and announced his intention and purpose to ignore and treat as unconstitutional and void these various enactments of the Legislature. Thereupon this bill was filed to enjoin him from exercising the duties of this office; and his answer is predicated upon the in-

validity of this legislation and the proceedings of the General Assembly. The questions presented, therefore, for our consideration involve the constitutionality of the Acts of the General Assembly and the potency of the resolution removing the defendant from office.

On behalf of the State it has been pressed upon our attention that at the last convention of both political parties in the State, preceding the session of the Legislature at which this legislation was enacted, platforms were adopted demanding retrenchment and reform in the judiciary, and the abolition of useless Courts and Court officers; that the adherents of these two political parties constitute practically the enire voting population of the State; that the Governor elected upon one of these platforms, in his message to the Legislature, recommended that measures be passed looking to the abolition of useless offices in the judiciary and the abolition of such Courts as were not needed. It is insisted that the Acts in question, as well as similar Acts applying to other parts of the State, were passed in obedience to the almost unanimous demand of the people of the State, and that, therefore, this Court should not lightly pass over these considerations in determining the validity of these laws.

Upon the other hand, it has been urged upon us on behalf of the defendant, that these particular laws were passed in obedience to no public

demand, but for some sinister purpose; that this defendant had been singled out, and that his office had been abolished for the invidious purpose of legislating him out of office; that the Legislature, in so doing, had been guilty of sinister motives, and that this Court should annul the legislative acts in the interest of the independence of the judiciary of the State, and should investigate the proceedings of the Legislature, as disclosed by its journals and published Acts, and hold that the Legislature was actuated by improper motives, and had not passed these Acts in good faith and in the public interest.

But neither one nor the other of these contentions can have any weight with this Court. In the division of the powers of the three separate and co-ordinate branches of the government, certain powers are confided to each, and the judiciary has no more right or warrant to invade and usurp the powers vested in either of the other branches of the government than have the other branches the right to invade and usurp the powers confided to the judicial department of the government; and to do so would be to violate that provision of the Constitution so earnestly relied upon by the defendant, that the three departments of the government are separate and distinct; and, on the other hand, if the Court should permit itself to be influenced in the slightest degree by what had been said or done in political conventions, or

what had been said and done in obedience to public opinion, in its investigation of and construction of the constitution, it would tend to destroy its own independence, which, in its own sphere, is as absolute and as much protected and guarded in the Constitution as is that of the other departments in their respective spheres. It is only by remembering the limits of the power confided to the judicial department of the government and respecting the indepdence of the other departments that the judiciary can maintain its own independence in the proper sense of the term; and whatever expedients may have been thought proper to preserve this independence, and whatever fears may have existed in the minds of the public men in the early history of the country with respect to the judiciary not remaining independent, the experience of a century has demonstrated that all such fears were wholly groundless, and that the independence of the judicial department of government in this country has been maintained and exists, not by artificial restraints in written laws and constitutions, but has rested, and will continue to rest, upon the respect of the people of the country, brought about and maintained by the uprightness, integrity, learning, and justness of the various Courts throughout the country; and the fact that the judiciary has not been ambitious to usurp or claim for itself one particle more of power or authority than was

State, *ex rel.*, *v.* Lindsay.

contemplated and vested in it by the Constitution, is one of the . reasons of its present independence and one of the causes entitling it to the respect of the people.

Mr. Justice Miller, in a lecture upon the Constitution of the United States, used this language:

" The judicial branch is the weakest of all. It has no army, it has no navy, and it has no purse. . . . It is, then, so far as the ordinary forms of power are concerned, by far the feeblest branch or department of the government. It must rely upon the confidence and respect of the public for its just weight and influence, and it may confidently be asserted that neither the country, the people, nor the other branches of the government have ever been found wanting in that respect or confidence. It is one of the best tributes which can be paid to the American nation, a tribute which it deserves above all others, even of Anglo-Saxon descent, and one which can be paid to no other race, that it always submits to the law as expounded by its judiciary. Under all the excitements of bitter contests, involving great financial interests, power, position, and even political existence; in fact, everything which could be properly brought within its judicial cognizance, the people have always felt that their interest was safely intrusted to its charge." Miller's Constitution of the United States, p. 96.

And it must in this connection be remembered

State, *ex rel.*, *v.* Lindsay.

that the power assumed by the judiciary to declare legislative enactments void is not an expressly granted power in the Constitution; it exists only by implication, and was adopted from necessity. There is scarcely a European government in which Courts can even permissively exercise such a power. It was very generally denied in the formative period of our system of government. As late as 1808 articles of impeachment were preferred against Judges who declared an Act of the Legislature void, and they were put upon trial for this supposed offense. 1 Chase's Statutes of Ohio, preface, 30-40.

In *Eakin* v. *Raub,* 12 S. & R., 330, Mr. Justice Gibson, as late as 1825, wholly denied such a power under any Constitution which did not expressly give it. Thereafter, in 1845, in the case of *Norris* v. *Clymer,* 2 Pa. State, 281, while Chief Justice of the Supreme Court, he stated to counsel during the argument, this: "I have changed that opinion for two reasons. The late convention (Constitutional Convention of 1838), by their silence, sanctioned the pretensions of the Court to deal freely with the Acts of the Legislature; and from experience of the necessity of the case."

It is not surprising, therefore, that Courts have always regarded this duty as a delicate task, to be entered upon with reluctance and hesitation. Nevertheless, this task must be performed when occasion demands it, and if in the exercise of an

entirely independent judgment the Court concludes that the Legislature has exceeded its authority under the written Constitution, it becomes the plain duty of the Court to so declare, regardless of the consequences to itself or others. But it is scarcely necessary to add that it is everywhere and has at all times been held that this power can be exercised only in clear cases, and that all doubts must be resolved in favor of the validity of the Act of the lawmaker. This rule of construction, as applied to the Acts of a co-ordinate branch of the government, is "something more than a mere form of language, a mere expression of courtesy and deference. It means far more than that."

The particular provisions of the Constitution involved in this controversy are these:

"The powers of the government shall be divided into three distinct departments: the legislative, executive, and judicial. . . . No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted. . . . The judicial power of this State shall be vested in one Supreme Court, and in such Circuit, Chancery, and other inferior Courts as the Legislature shall from time to time ordain and establish; in the Judges thereof, and in Justices of the Peace. . . . The Judges of the Circuit and Chancery Courts and

of other inferior Courts shall be elected by the qualified voters of the district or circuit to which they are to be assigned. . . . His (their) term of service shall be eight years."

The decisions of this Court, discussed by counsel, and which have dealt with these particular provisions of the Constitution, are as follows:

In *Coleman* v. *Campbell,* 3 Shan. Tenn. Cases, 355 (1875), it was held that the Legislature had the power to abolish the Second Chancery Court and the Second Circuit Court of Shelby County, and to direct the transfer of the records and pending causes to the regular Chancery and Circuit Courts, respectively. These two Courts had been created by the Legislature prior to the Constitution of 1870, and were abolished by Chap. 25 of the Acts of 1875.

In *Halsey* v. *Gaines,* 2 Lea, 316 (1879), it was held that this Act of 1875, abolishing the Second Circuit Court of Shelby County, ended the term of office of the Judge of that Court, and that the abolition of the office extinguished the judgeship. The Court in that case reaffirmed the construction of the Constitution announced in the case of *Coleman* v . *Campbell, Ibid.*

In *State* v. *Leonard,* 86 Tenn., 485 (1887), it was held that Chap. 84 of the Acts of 1887, in which the Legislature undertook to abolish the office of a County Judge and to transfer its powers, duties, and jurisdiction without diminution

or change to the Chairman of the County Court, to be thereafter elected, was unconstitutional, for the reason that it was a plain attempt to deprive the County Judge of his office and substitute another person, to be thereafter elected by the County Court, who, when elected, should have the same duties, powers, jurisdiction, and compensation as had been held and enjoyed by the County Judge.

In the light of these adjudications, the Legislature, by Chap. 64 of the Acts of 1899, abolished part 2 of the Chancery Court of Shelby County, and by Chap. 155 of the Acts of 1899, abolished the Criminal Courts of the Eleventh Judicial Circuit, and by another Act transferred these Courts to other and adjoining circuits. The validity of these Acts came before the Court for its determination at its April term last, and upon full argument and mature consideration it was held by the Court that the Acts were constitutional. *State* v. *Thornton,* 102 Tenn., 509, and *McCully* v. *The State,* 102 Tenn., 509. The Leonard case was held to be wholly dissimilar · to the Coleman and Halsey cases, and it was announced that the reasoning in these last-named cases was controlling. The Coleman case was analyzed and held authority for the following propositions, which were reaffirmed:

"First, the Legislature has the constitutional power to abolish particular Circuit and Chancery Courts,

and to require the papers and records therein to be transferred to other Courts, and the pending causes to · be heard and determined ·in the Courts to which they are transferred. The power to ordain and establish, from time to time, Circuit and Chancery Courts includes the power to abolish existing Courts, and to increase or diminish the number. Second, the Judge's right to his full term and his full salary is not dependent alone upon his good conduct, but also upon the contingency that the Legislature may, for the public good, in ordaining and establishing · Courts from time to time, consider his office unnecessary and abolish it. The exercise of this power by the Legislature is neither such as interferes with the independence of the Judge or with his tenure of office as can be complained of. When the Court or Courts over which a Judge presides is abolished, the office of the Judge is extinguished and his salary ceases."

In the Thornton and McCully cases this Court held that the Legislature has the power to detach counties from one circuit or division and add them to another, and that it is not a valid objection to the exercise of this power that it may result in placing the people of counties so transferred temporarily under the jurisdiction of a Judge or Chancellor in whose election they have had no voice.

In the case at bar, the most serious contention

is that the decisions of this Court, in the construction of the clauses of the Constitution above quoted, do not embrace and govern the present case, because in this case the Legislature by one sweeping Act has undertaken to abolish the Second Chancery Division; and the argument is that this did not abolish the office of Chancellor of the Second Chancery Division, because the Chancellor is Judge of the particular Courts in the division, and before his office can be extinguished, the Courts presided over by him must be abolished.

It is conceded by counsel that, under the holdings of this Court, it is competent for the Legislature to detach one county from a Chancery Division and attach it to another, and that it is competent for the Legislature to abolish a Court and transfer its jurisdiction and powers, together with its records and pending causes, to another similar Court, and that the abolition of a particular Court extinguishes the judgeship. It is difficult to see any good reason why it is competent for the Legislature to abolish a Court entirely and thereby extinguish the judgeship, and to detach one county from a given division and attach it to another, and yet incompetent for the Legislature to abolish an entire Chancery Division and attach the various counties comprising such Chancery Division to other adjoining divisions. In this case this was done by two separate Acts,

but if the first Act abolishing the division had not been passed, the second Act attaching all the counties to other divisions would have accomplished the same result. It is said that, while conceding that the power to abolish a particular Court or detach and attach a particular county to another circuit, is constitutional, yet these cases proceed in the wrong direction, and that the precedent and doctrine of these cases are dangerous and should be limited to their special facts. This, we submit, is but an argument against the policy of legislative action, and is not an argument against the validity of the power assumed by the Legislature. If it be conceded that the doctrine of these cases is correct, then the extent to which the Legislature may go in this direction is purely a question of policy, and not of power, and is therefore beyond our jurisdiction.

In the McCully case, it was held that the Legislature could abolish the Criminal Courts of the Eleventh Judicial Circuit, and that this deprived the Judge of that circuit of his office. The Courts in the various counties composing this circuit were divided up among the adjoining circuits, so that in at least two counties the Courts were thereafter to be held by Judges who had not been elected by the voters of these two counties.

We are of the opinion that the Legislature has the power to abolish a Chancery Division, and

that this extinguishes the office of Chancellor of that division. The Chancellor is elected to hold the Courts of that particular Chancery Division, either as it then exists or as it may from time to time be changed by the Legislature; and when the Chancery Division is entirely abolished, and not re-established, as in the Leonard case, and the counties comprising the division are assigned and transferred to other adjoining divisions, as was done in this case, the office of Chancellor of the abolished division is extinguished. Nor is this view of the question weakened by the supposed cases of what the Legislature might do, and the awkward results that might follow therefrom. It is not to be presumed that the Legislature will by any attempt in this direction deprive the people of the requisite number and character of Courts, or that it will abuse its power in this regard any more than in any other direction. As was said in the Coleman case: "Against such abuse of legislative power, the ballot box is the legitimate remedy." And it may also be added that we are dealing with the situation that exists, and not with one of these supposable cases put in argument. It will be time enough to deal with such cases when they arise.

It is said that the Constitution recognizes a Circuit Court and a Chancery Court for each county of the State as a constitutional Court, and that, therefore, such Courts are

as fully secured by the Constitution as is the Supreme Court, each of these Courts being provided for by name in the same section. It is further said that the Circuit or Chancery Court in each county can no more be abolished than can the Supreme Court; that the one is as sacred to the Constitution as the other. In a modified sense this is true. The Constitution of 1870, unlike the Constitution of 1834, expressly ordained that the Legislature, in establishing inferior Courts, should preserve Circuit and Chancery Courts. But this language cannot be extended in the manner contended for. Circuit and Chancery Courts have not always been provided for each separate county in the sense that there was a Circuit Court and a Chancery Court in each particular county for that county alone. The Constitution merely required and emphasized the fact that the distinction between law and equity Courts should be maintained, and not effaced, as in many other States; and that the citizens of each county should have access to a Chancery and a Circuit Court, established either for each particular county or for any number of counties. There was a time in the history of the State when one Chancery Court was established for many counties; but for many years past the Legislature, in its discretion, has established and maintained a Chancery Court and a Circuit Court in each county, instead of combining several coun-

19 P—41

ties and establishing one Chancery Court or one
Circuit Court for these counties in the aggregate.
But having established one Chancery Court and
one Circuit Court in each county of the State,
it then provided that one Chancellor and one
Circuit Judge should be elected for a Chancery
Division and a judicial circuit comprising a num-
ber of counties, and that the Chancellor of the
Chancery Division should hold the Chancery Courts
and that the Circuit Judge should hold the Cir-
cuit Courts established in each particular county
in that division or circuit. These observations but
strengthen our opinion that the Legislature has
the right to abolish a Chancery Division and to
assign the various counties composing it as com-
ponent parts of the adjoining or surrounding di-
visions, and that by so doing the office of
Chancellor of the abolished division is extinguished,
and the Chancellor, having no duties to perform,
is no longer an officer. Indeed, to this last
proposition the opinion of the dissenting Judges
in the McCully case fully agrees, the exact lan-
guage being: "And it (the Legislature) cannot
therefore abolish a Circuit or Chancery Division,
because that would destroy the Judge."

It is further insisted that this legislation abol-
ishing the Second Chancery Division is personal
against the defendant, and is not a general law.

With respect to this proposition, little need be
said. We are invited to examine the journals of

the two Houses of the Legislature in connection with the published Acts, and to hold that they disclose upon their face a sinister purpose upon the part of the Legislature to legislate out of office the defendant in this case; and for this proposition the following language of the Court in the Halsey case is cited: "We concede the legislation which indirectly aims to legislate the Judge out of his office before his constitutional term expires, under the guise of changing the circuit or otherwise, would be unconstitutional and void. Such is the character of the cases referred to; but in our opinion this is a wholly different case."

Our attention is further directed to the fact that while the abolition of the Second Chancery Division and the reassignment of the various counties composing it to the adjoining divisions only lasts, by the terms of the Act, until September, 1902, when the general redistricting Act of the Legislature takes effect, the County of Knox, one of the largest and wealthiest counties in the abolished division, is entirely omitted from the general redistricting Act, and that, therefore, after 1902 there is no Chancery Court provided for this county. We are also invited to examine the geographical position of the counties composing the First, Twelfth, and Second Chancery Divisions prior to this legislation, and to see in what an awkward and unreasonable division the counties

have been arranged in the First and Twelfth Chancery Divisions under this temporary redistricting Act. Our attention is also directed to the report of the legislative committee appointed to investigate the work of each Court, where it is said it appears that the Chancellor of the Second Chancery Division had decided more cases and held court more days than either the Chancellors of the First or Twelfth Chancery Divisions, and it is pressed upon us that from these facts we should conclude that the Legislature was actuated by sinister motives, and was not legislating for the public good in abolishing the Second Chancery Division and dividing its counties between the First and Twelfth Chancery Divisions.

Without undertaking to state what kind of cases the learned Judge had in mind in using the foregoing language, and without assuming the authority and power to investigate the proceedings of a distinct and co-ordinate branch of the government, with a view of inquiring into and passing upon the motives of the members constituting this co-ordinate department, which all will concede would be unseemly, we are of opinion that the facts relied upon do not justify the conclusion or the inference sought to be drawn therefrom. It is perfectly manifest that the omission of Knox County in the general redistricting Act which is to take effect in 1902, was either an

oversight, or, most probably, a mistake either in copying or printing the proceedings of the Legislature. In any event, it cannot indicate anything more than a mistake or an oversight. It in nowise invalidates the Acts under consideration. With respect to what has been said regarding the awkward shape of the First and Twelfth Divisions, and the statement that it would have been better and more natural for the Legislature to have abolished the Twelfth or the First Division rather than the Second, we can only say that this was a matter of discretion addressing itself alone to the Legislature, and which this Court can neither interfere with nor criticize. An examination of all these matters merely indicates that it became apparent to the Legislature that the three divisions were unnecessary, and that one or the other should be abolished. This naturally precipitated a contest between the friends and adherents of each of the three Chancellors as to which division should be abolished. The Legislature selected the Second, and the same argument, it seems to us, could just as well be made by the Chancellor of the First or of the Twelfth Divisions if either of those divisions had been selected instead of the Second.

We therefore concur with the Court of Chancery Appeals in its opinion that, "taking all these facts together, we do not think that we are warranted in holding that that the Acts abolishing

the Second Chancery Division and distributing the counties between the First and Twelfth Divisions were indirectly proceedings against Judge Lindsay as an obnoxious person."

We therefore conclude that the Act of the Legislature abolishing the Second Chancery Division and reassigning the Courts formerly contained in that division was adopted in the exercise of a constitutional power, and that with the abolition of the Second Chancery Division the office of the defendant was extinguished. The defendants in the other two cases were Judge and State's Attorney, respectively, in a judicial circuit which was abolished and its Courts attached to other circuits, and the result is the same in these two cases as in the first case.

The resolutions of the Legislature removing the defendants from office were passed under another clause in the Constitution, providing that "Judges and attorneys for the State may be removed from office by a concurrent vote of both Houses of the General Assembly, each House voting separately; but two thirds of the members to which each House may be entitled must concur in such vote."

In view of our conclusions upon the validity and effect of the other legislation, it becomes unnecessary to discuss the questions sought to be raised with respect to the validity of the proceedings under this clause of the Constitution, and

State, *ex rel.*, *v.* Lindsay.

we therefore refrain from any discussion of this branch of the case.

It results from what we have said, that the decrees of the Court of Chancery Appeals, sustaining the bills and reversing the decrees of the Chancellor, are affirmed with costs.

Chief Justice Snodgrass and Judge Beard do not concur.