T. C. ILES, CHAIRMAN, *v.* J. P. MATLOCK *et al.*

FROM LOUDON.

Appeal in error from the Circuit Court of Loudon County.—GEORGE L. BRUKE, Judge.

E. P. MCQUEEN, for Iles, Chairman.

A. S. HENDERSON, J. E. CASSIDY and PICKLE & TURNER, for Matlock.

All of the foregoing cases were heard together in the Supreme Court.

MR. JUSTICE NEIL delivered the opinion of the Court.

These cases were brought in the courts of the several counties above named, and, in various forms, involve the constitutionality of certain acts passed by the legislature of 1903 abolishing divers civil districts in the counties named.

In order to a proper understanding of the exact questions raised, it will be necessary to quote the title and two sections of one of these acts. We select the Roane county act, which fairly represents the form and substance of all of the others.

The act affecting Roane county is chapter 16, p. 41, of the Acts of 1903.    The title of the act is as follows:

"An act to abolish the first, second, fourth, sixth, seventh, eighth, ninth, eleventh, twelfth, fourteenth, fifteenth, tenth, eighteenth, nineteeth, twentieth and twenty-first civil districts of Roane county, as now laid out and constituted; to abolish the offices of the justices of the peace and constables thereof; to attach the territory therein to the third, fifth, seventeenth, thirteenth and sixteenth civil districts of said county and to renumber the same."

After making the changes above indicated, the act proceeds as follows:

"Sec. 3.    Be it further enacted, that the number of civil districts for said county as herein established shall not be increased or diminished except by act of the general assembly.

"Sec. 4.    Be it further enacted, that the offices of all justices of the peace and constables, in the several districts herein abolished, be, and the same are hereby abolished, but this act shall not be construed to apply to justices of the peace elected in and for incorporated towns in said county."

The matter contained in the last clause of section 4, just quoted, does not appear in any of the other acts.

The general law in existence and applicable to all the counties of the State at the time these acts were passed is to be found in sections 95 to 99, inclusive, of Shan-

non's Code, and in the corresponding sections of the Code of 1858—77 to 81, inclusive.

The first of these sections, taken from the act of 1835 (Acts 1835-36, p. 19, c. 1, section 2), provides that the districts already laid off in the several counties of the State shall continue until altered in the manner pointed out by law.

The remaining sections provide a general plan for laying off counties into civil districts by the county court.

Before entering upon a particular consideration of the acts above referred to, it is deemed useful to recall a principle of accepted authority in the science of constitutional construction, to the effect that the constitution is not the beginning of law for the State, but it assumes the existence of a well-understood system which is to remain in force, and to be administered under such limitations and restrictions as that instrument imposes (Cooley, Constitutional Limitations, 74; *People* v. *Draper,* 15 N. Y., 532; *Pope* v. *Phifer,* 3 Heisk., 682; *Williams* v. *Taxing District,* 16 Lea, 535), and that, in construing the constitution, the state of the community at the time is was created must be considered (*Pope* v. *Phifer,* 3 Heisk., 686, 687; *Jackson* v. *Nimmo,* 3 Lea, 600).

Bearing in mind the rule above mentioned, it is to be remembered that, when the convention of 1870 undertook its work, it had before it a State fully organized, and possessing a constitutional, legislative, and judicial history. The State was then, as now, a political entity,

The Redistricting Cases.

having a corps of officers that were distinctly State offi-
cials, namely, a governor, the heads of the several de-
partments of State, judges of the supreme court, the at-
torney-general, and reporter to the State, clerks of the
supreme court, and the members of the two houses of the
general assembly. . Then, as now, the State was divided,
for convenience of administration, into counties, and
these counties had each its corps of officers, namely, jus-
tices of the peace, constables, a sheriff, coroner, ranger,
trustee, register, clerk of the county court, clerk of the
circuit court, and clerk and master of the chancery court.
Then, as now, the counties were already divided into civil
districts, in which were to be elected justices of the peace
and constables.    The several counties were at that time
also grouped into judicial circuits and chancery divis-
ions; each circuit being presided over by a circuit judge,
and served by a district attorney for the State, and each
chancery division being presided over by a chancellor.
These were also State officers, but assigned to limited
areas—their respective circuits and divisions—and these
areas were subject to change from time to time by the
legislature.

Before coming directly to a consideration of the acts
in question, it will be proper to make a short review of
the decisions of this court upon the constitutional
powers of the legislature over such of the above-men-
tioned offices as have been drawn into litigation or have
been commented upon in the decisions of this court.

The most conspicuous of these offices which have thus

been drawn into litigation are those of the circuit judges and chancellors.

At the September term, 1875, this court had under consideration an act entitled "An act to abolish the second circuit court and the second chancery court of Shelby county." In that case the following propositions were established, namely: That the power to ordain and establish courts contained in article 6, section 1, of the constitution of 1870, includes the power to abolish particular circuit and chancery courts, but the legislature cannot abolish the distinctive character of circuit and chancery courts themselves (that is, cannot abolish the system) ; that upon the abolition of a circuit or chancery court, with all of its powers and jurisdiction, the necessary consequence is that the circuit judge or chancellor is deprived of his office. *Coleman* v. *Campbell,* 3 Shannon's Cas., 355. The last of these propositions was reaffirmed at the April term, 1879, in *Halsey* v. *Gaines,* 2 Lea, 316; and all of them were reaffirmed at the April term, 1899, in the *Judges' Cases,* 102 Tenn., 509 et seq., 53 S. W., 134, and in *State* v. *Lindsay,* 103 Tenn., 625, 53 S. W., 950, and, in substance, in the case of *State, ex rel.,* v. *King,* 104 Tenn., 156, 57 S. W., 150, decided at the December term, 1899.

In *Powers* v. *Hurst,* 2 Humph., 24, it was held that a register's constitutional term of four years could not be shortened by law; in *Brewer* v. *Davis,* 9 Humph., 208, 213, 214, 49 Am. Dec., 706, the same decision was made in respect of the four-year term of a circuit court clerk.

The Redistricting Cases.

In *State* v. *Cummings,* 99 Tenn., 667, 683, 42 S. W., 880, it was held that the legislature could not deprive the sheriff of a substantial element of his office, as to take from him the county jail, and the care and custody of the prisoners therein, or abolish his office, for the reason that he is a constitutional officer, and, as such, protected by the constitution.  In *State* v. *Leonard,* 86 Tenn., 485, 7 S. W., 453, it was held that the legislature has no power to terminate the office of a judge of a county court elected under a constitutional law, and for a constitutional term of eight years, within that term, at the same time leaving the court with its jurisdiction in existence and unimpaired, by simply devolving the duties of the office upon another official, namely, the chairman of the county court.

As to the office of justice of the peace, it was held in *Keys* v. *Mason,* 3 Sneed, 6, under the constitution of 1834, that the term was six years as to all justices of the peace, whether elected to fill a vacancy, as the one in question was, or elected generally, and that a legislative act was void which undertook, by direct legislation upon the office, to cut down the term of such a justice of the peace (one filling a vacancy) to the unexpired term of his predecessor.

In *Cross and Mercer, ex parte,* 16 Lea, 486, the same question, in a special aspect, was again considered.

All of the foregoing authorities were referred to in the *Judges' Cases,* 102 Tenn., 510, 53 S. W., 134, and a comparison was there instituted between the offices above

mentioned—register, sheriff, county judge, and the supreme court, on the one hand, and the inferior courts, upon the other.

In that case there were two opinions delivered in behalf of the majority of the court—one by McAlister, J., and the other by Wilkes, J.; the two concurring throughout, except upon one point, which does not fall within the scope of the present inquiry, and need not be further mentioned.

The opinion of McAlister, J., after stating that *Keys* v. *Mason,* 3 Sneed, 6, *Cross and Mercer, Ex parte,* 16 Lea, 486, *Powers* v. *Hurst,* 2 Humph., 24, and *Pope* v. *Phifer,* 3 Heisk., 682, bore no relation to the question there under consideration, proceeded: "The case of *State* v. *Cummins,* 99 Tenn., 667, 42 S. W., 880, in which he held that the constitutional office of sheriff was inviolable, was not at all analogous to this case. Article 7, section 1, const. 1870, provides, 'There shall be elected in each county one sheriff, one trustee, one register,' etc. This provision is similar to the other clause providing for one supreme court. How different the other clause, empowering the legislature from time to time to ordain and establish circuit, chancery and other inferior courts! One is established by the constitution, and the others are established by the legislature." 102 Tenn., 545, 53 S. W., 143.

In the opinion of Wilkes, J., after the statement that *Cross and Mercer, Ex parte,* supra, did not affect the controversy, the following was said:

The Redistricting Cases.

"The case of *State* v. *Cummins,* 99 Tenn., 667, 42 S. W., 880, holds that the legislature cannot deprive the sheriff, who is a constitutional officer, of a substantial part of his powers and functions. The office of sheriff is one *sui generis.* It is provided for by the constitution, but the duties of the office are not defined. There can be only one in any county, and no other officer in the county has the same functions and powers. The same is true of the county judge, as in the *Leonard Case,* and the county register, as in the case of *Powers* v. *Hurst,* 2 Humph., 24. They are all offices recognized by the constitution, and there is no other officer upon whom the same functions and powers are devolved, and the legislature can create no other. There is no provision for ordaining and establishing a number of these offices. In many respects they stand upon a footing similar to that of supreme judges. There can be but one supreme court for the State, and one county judge, one sheriff, and one trustee, and register for a county, and the legislature has no power to create more; nor can their powers, duties, and functions be taken from them and devolved upon others." 102 Tenn., 571, 572, 53 S. W., 149.

Again: "It is evident from the provisions of the constitution that but few limitations were intended to be placed upon the power of the legislature to create, establish, and change inferior courts. Limiting safeguards are placed around the supreme court, to protect it both from legislative and executive control, which are not

placed around the inferior courts. It was provided that
there should be but one supreme court, so that its powers
and prerogatives could not be lessened by being divided.
The number of judges was fixed, so that it could neither
be increased nor diminished.    The places of holding its
courts were fixed, so that they could not be changed.
None of these limitations were thrown around the in-
ferior courts.    The number of courts, the number of
judges, and the places of holding those courts were left
to be determined by the legislature." 102 Tenn., 561,.
562, 53 S. W., 147.

But passing these authorities, we shall consider the
matter on principle; that is, upon a direct construction
of the constitution in respect of the power of the legis-
lature over the office of justice of the peace.

This involves the prosecution of several collateral in-
quiries—the nature and office of the county in our sys-
tem, the nature and purpose of the civil districts,
the essential nature of the office of justice of the
peace, the power of the legislature to pass special laws,
and the limitations upon that power.

It is not our purpose to go into any of these subjects
at large, but only to indicate in the briefest way, con-
sistent with a clear understanding of the matter, the
outlines of them.

As previously stated, when the constitution of 1870
was framed, the present political organization of the
State was in existence; the State itself was an organ-
ized body, was divided into counties, and these were sub-

divided into civil districts. This was equally true when the constitution of 1834 went into effect, and also even when the constitution of 1796 was promulgated. The division, indeed, into counties, is general over all of the States of the Union. This system is one of the institutions which came down to us from our English ancestors, and has continuously commended itself to the good sense and to the hearts and homes of the people, because of its convenience in local self-government, and because it has been felt, although perhaps not uttered, as an expression of that instinct of the race for segregation into small communities bound together by a common tie, and, going still further, into households and families, all together making the constituent parts of one great whole, the State.

Yet, notwithstanding this trend, counties in this State, at last, have not attained any very high complexity of organization; that development having been reserved for municipalities proper, which more perfectly express the community life above referred to.

Still our county organizations are very distinct, and along certain broad, general lines, their functions are clear.

It is quite impossible, however, to speak intelligently of our county organizations without bringing into view the county court, the chief organ in the expression of its political, judicial, and municipal life.

In one of our earliest cases, while we were yet living under the constitution of 1796, the question was asked:

"What is a county, in our political association?" And it was answered thus: "It is a political community, formed by the constitution and acts of assembly, having its rights, its duties, its obligations, its privileges, its officers, civil, military, judicial, and ministerial—the field of the action of all, which is local and limited to the confines of the county. Those rights, duties, offices, etc., are exercisable in the county by the body politic, or community composing the county, exclusive of the agency of the officers of any other like community or county. This organization is general, and applies to every county in the State." *Stewart* v. *Roberts,* 1 Yerg., 389.

In another early case, while the constitution of 1834 was in force, it was said: "A county is a public corporation, created by the government for political purposes, and invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and such powers are, in general, subject to the control of the legislature of the State. 2 Kent, Comm., 275. The county court, or the justices composing this court, represent the civil and political power of the community, its rights and obligations. It is through this medium, therefore, that the county in its municipal character, as a corporation, may act or be acted upon. There is no other court or officer known in its organization that can or should represent it." *Maury County* v. *Lewis County,* 1 Swan, 236, 240. See, also, *Ezell* v.

*Justices of Giles County,* 3 Head, 585, 586; *Wilson* v. *Davidson County,* 3 Tenn. Ch., 536, 540.

Under the constitution of 1870, it has been said: "A county, under our law, is a corporation; the citizens are the corporators; the county court, the agency through which this mortal immortal acts and speaks and has its being." *State* v. *Anderson County,* 8 Baxt., 258; *Beck* v. *Puckett,* 2 Shannon's Cas., 490, 495, 496.

Again: "Every county is a corporation." *Railway Co.* v. *Wilson,* 89 Tenn., 603, 15 S. W., 446; *State v. Anderson County,* 8 Baxt., 258; *Hawkins* v. *Railroad,* 1 Tenn. Cas., 292, 303; *Winston* v. *T. & P. R. R. Co.,* 1 Baxt., 73.

The county is also a municipal body, and as such is an arm or instrument of the State, to carry out purposes of government; but it is not so highly organized as the municipal corporation proper (town or city), which is also an arm of the State government. *Williams* v. *Taxing District,* 16 Lea, 535, 536. The counties are inviolable by the courts. The courts may enjoin commissioners from erecting a county created by an unconstitutional act, while the matter is *in fieri,* but cannot adjudge the county a nullity after it is actually erected. *Ford* v. *Farmer,* 9 Humph., 152; *Bridgenor* v. *Rodgers,* 1 Cold., 259, 261; *Humphreys County* v. *Houston County,* 4 Baxt., 598. Nor, after a county is once established, can the legislature abolish it, without first obtaining a vote of the people comprising such county.

*James County* v. *Hamilton County*, 89 Tenn., 237, 14 S. W., 601.

. The powers vested in the counties, in the person of their ancient exponent, the county court, were thus summarized by Nicholson, C. J., in 1872: "The powers conferred on the county courts are of several distinct kinds, but sometimes so closely allied in their nature that the distinctions are not readily perceived. The laying of a county tax is characterized as a municipal power given for the regulation of the fiscal affairs of the county. *Obion County Court* v. *Marr*, 8 Humph., 634. The power to impose taxes for county purposes is not judicial, and might have been confided to any other agents. *Justices of Cannon County* v. *Hoodenpyle*, 7 Humph., 146. An order to build a courthouse is only a police order. *Carey* v. *Justices*, 5 Sneed, 515. The power to open roads is exercised by the county courts, not as a judicial, but a municipal, function. *Franklin, etc., Turnpike Co.* v. *County Court*, 8 Humph., 342. But in all cases which involve the rights of individuals on which the county courts are authorized to adjudicate, they exercise judicial powers. The powers conferred on the county courts are termed judicial, municipal, and police powers. The constitution authorizes the legislature to vest in the courts of justice such powers with regard to private and local affairs as may be deemed expedient. Article 11, section 9. Under this provision of the constitution the legislature has vested in the county courts the power defined in the Code in regard to

taxation and to roads. The county courts are thereby constituted corporations with defined powers, and with the justices thereof as representatives of the county. They can exercise that portion of the sovereignty of the State communicated to them by the legislature, and no more. In the exercise of the powers so conferred, they become miniature legislatures, and the powers so exercised by them, whether they are called municipal or police, are in fact legislative powers." *Grant* v. *Lindsay,* 11 Heisk., 666.

This court was a part of the organized machinery of the State government at the adoption of the constitution of 1834, and had been of the State of North Carolina before the adoption of our original constitution of government of 1796. By that constitution (art. 6, section 1,) it was provided: "There shall be appointed in each county, by the county court, one sheriff, one coroner, one trustee, and a sufficient number of constables, who shall hold their offices for two years. They shall also have power to appoint one register and one ranger for the county, who shall hold their offices during good behavior." By article 5, section 12, it was provided that "justices of the peace shall be appointed for each county." This number was limited to two for each captain's company, except for the company including the county town, and in this it was provided they should not exceed three. This constitution contained no express provision establishing the county

111 Tenn—17

court. It was simply recognized and treated as one of the existing institutions of the State, well known, and therefore referred to simply as the "county court." This institution, as then recognized, continued in existence as the chief part of the governmental machinery of the counties up to the adoption of the constitution of 1834. By this constitution it was provided (article 6, section 15) that the counties of the State should be laid off into districts of convenient size, so that the whole number in each county should not exceed twenty-five and that there should be two justices of the peace elected for each district, including county towns, which should elect three, etc. In article 7, section 1, it was provided, among other things: "There shall be elected for each county, by the justices of the peace, one coroner and one ranger, who shall hold their offices for two years." By section 2, same article, it was provided: "Should any vacancy occur, subsequent to an election, in the office of sheriff, trustee, or register, it shall be filled by the justices," etc.

It was held in *Pope* v. *Phifer*, 3 Heisk., 682, from which we have taken the historical statements contained in the preceeding paragraph, that the powers above referred to were to be exercised by the justices of the peace assembled in what we now know as the quarterly county court.

The same provisions are contained in the constitution of 1870. In article 7, section 1, it is provided: "There shall be elected for each county, by the justices of the

peace, one coroner and one ranger, who shall hold their offices for two years." And while, as under the constitution of 1834 (therein differing from the constitution of 1796,) it was provided that the sheriff, trustee, and register should be elected by the people, yet it was further provided (article 7, section 2,) "Should a vacancy occur, subsequent to an election, in the office of sheriff, trustee or register, it shall be filled by the justices . . and the person so appointed shall continue in office until his successor shall be elected and qualified," etc.

Under article 2, section 29, it was provided that the legislature should have power to authorize the several counties to impose taxes for county purposes, and this duty has been devolved by the legislature, as it had authority to do, upon the county court; that is, upon the justices assembled in that capacity.

By article 6, section 1, a portion of the judicial power of the State was devolved upon them. By the fifteenth section of this article the jurisdiction of these officers is declared to be "co-extensive with the county," their terms are fixed at six years, and they are required to be commissioned by the governor. As to their number, this section provides that "two" shall be "elected in each district by the qualified voters therein, except districts including county towns, which shall elect three justices." The same section declares that "the legislature shall have power to provide for the appointment of an additional number of justices of the peace in incorporated towns." As to their place of residence, the section

provides that, upon the removal of a justice of the peace "from the district in which he was elected, his office shall become vacant from the time of such removal."

This brings us to a consideration of the nature of the civil district.

It appears from the provisions of the constitution just referred to that the civil districts were intended to occupy an important place in the political organization of the counties, in that their number determined, in the main (indeed, wholly, if we exclude the justices of the peace elected by incorporated towns), the number of justices of the peace that each county should have, and hence the number of the constituent members of the governing body of the county, the county court, and that they constituted the means or agency through which the legislature was to retain, by constitutional reservation, its control over the county organization, as a part of the political framework of the State. The intimate relation between the justice of the peace and his civil district is also shown, not only by the provision that he shall be elected in or by some civil district of the county, but by the further provision that he shall continue to reside there, and that his removal therefrom shall vacate his office. This intimate relation is further emphasized by the acts which were passed in 1835, soon after the adoption of the constitution of 1834, and which may be treated as a legislative construction of the constitutional provision (and the constitution of 1834 is the same as that of 1870 on the point in question), or as an expres-

sion of the principles contained in that provision, in con-
nection with article 6, section 1, vesting a portion of the
judicial power of the State in justices of the peace.
These provisions appear in the following sections of the
Code:     "Every justice  of the peace should designate
some one day in every month when he will attend at his
usual place of residence, or at some other convenient
place in his district, to hear and determine all matters
cognizable before him."    Section 4127 (Shannon's Code,
section 5939).    By sections 4135 (Shannon's Code, sec-
tion 5947) and 4136 (Shannon's Code, section 5948,) it
is provided that there may be an interchange between
justices under certain circumstances therein stated—as,
for example, in the case of sickness, disability, or absence
from his district of a justice of the peace having a case in
charge.    In section 4137 (Shannon's Code, section
5949) it is provided that, in case of the temporary ab-
sence of a justice of the peace from his district for more
than three months, he shall deposit his dockets and pa-
pers, to the extent of unsettled business, with the near-
est justice, to be kept and acted upon as required by law.
By section 4114 (Shannon's Code, section 5926) to 4118
(Shannon's Code, section 5930), inclusive, the jurisdic-
tion of justices of the peace over parties in the trial of
civil actions is made to depend upon the civil district in
which the parties, plaintiff or defendant, respectively,
reside; that is, under one state of facts there set out, the
suit is to be tried in the civil district in which the plain-
tiff resides, but the general rule is laid down that the

suit must be tried, unless the parties consent to a different place, in the civil district in which the defendant resides, subject to certain exceptions, arising from the incompetency or absence of the justices of the peace of the civil district of the parties, or where the defendant has no fixed place of residence, or does not reside in the county.

All of these sections were taken from the Acts of 1835-36, p. 79, c. 17, except section 4114, which was taken from the Acts of 1837-38, p. 49, c. 18. Later, in 1851-52 (Code, section 4121; Shannon's Code, section 5933), it was provided that replevin and attachment suits should be tried in the civil district in which any portion of the property should be found. Again, in 1835 (Acts 1835-36, p. 45, c. 6), it was provided that the county court, in assigning jurors for the circuit court, should so dispose of the matter as that one of the jurors thus designated should reside in each one of the civil districts of the county, if practicable—otherwise, as nearly so as possible—and that the justices of the peace from each civil district should have the right to designate the juryman from that district. Code, sections 3981-3986 (Shannon's Code, sections 5793-5797.) Finally, in 1858—Code, sections 4147 (Shannon's Code, section 5959), 3590 (Shannon's Code, section 5355), 3609 (Shannon's Code, section 5374)—it was provided, in substance, that in performing his judicial functions the justice of the peace should preside over a court having a special officer attached thereto, the constable, as the officer of this court, and

also a clerk; the justice of the peace performing the latter function in addition to those of his judicial office.

It is thus seen that the offices of the several justices of the peace and the organization by civil districts are completely interwoven and that they are practically interdependent. Aside from the uses to which they are put as civil divisions for election purposes, and their function of fixing the number of the justices of the peace and constables allowable to a county, and as furnishing the base upon which the justices of the peace stand, and from which they proceed, and which they represent in the county court, the civil districts have but little meaning. It has been held that they cannot be endowed with corporate life, or have delegated to them the power of taxation. *Lipscomb* v. *Dean*, 1 Lea, 546. It is, indeed, the justices of the peace who are the true expression and potency of the political life of the civil districts, in our system. Similarly, the justices of the peace are dependent for their existence upon the civil districts, inasmuch as the constitution assigns them to civil districts and fixes their number by the number of the latter, and a definite apportionment between them.

It is thus seen that the true conception indicated by the term "justice of the peace," as disclosed by our constitution and statutes, is that of an officer having both judicial and political functions—judicial, in that he holds a court and decides matters of litigation arising between parties; political, in that he is a member of the quarterly county court, which is the governing agency

or legislative body of the county; but that, in performing all of the duties pertaining to these two functions he is, in the main, dependent upon his civil district, which creates him, which must be his home, which he cannot remove from without forfeiture of his office, and which he represents in the county legislature or county court.

There is an apparent exception to this conclusion in the case of justices of the peace elected by incorporated towns under enabling acts which the legislature is authorized to pass.    But a short consideration will discover that they do not constitute an exception.    Under a true construction of article 6, section 15, these justices of the peace bear the same relation to the incorporated towns which elect them as do other justices of the peace to their respective civil districts.    They must reside therein, and a removal therefrom will vacate their offices, and in the county legislature or county court they represent the incorporated towns which created them, just as do the other justices of the peace their respective civil districts.

All justices of the peace—those elected by the incorporated towns within the counties, as well as those elected by the civil district directly—are county officers, in the sense that when so elected their jurisdiction is co-extensive with the county.    But nevertheless it is a necessary accompaniment of and inherent in the office that these officers take their origin from and are depend- ent upon the respective civil districts and incorporated

towns which by the constitution and laws passed pursuant thereto, were authorized to create them.

It necessarily follows that, when these constituent organizations are in any manner lawfully abolished, the justices of the peace dependent thereon must likewise lose their place in the system. Any other view, especially in respect of those justices of the peace who are elected by civil districts, would inevitably result in a violation of the constitution. Starting with the assumption of a lawful and constitutional abolition of one or more civil districts in a county, and the annexation of the territory thereof to adjoining civil districts, then the continuation in office of the justices of the peace for the original districts would be a violation of that provision of section 15 of article 6 which fixes the limit of two justices of the peace to civil districts in the country, and three for districts including county towns, in that there would be four justices of the peace in country districts, and five in those districts containing county towns.

We are aware that there is a dictum in *Britton* v. *Moody*, 2 Cold., 15, to the effect that the constitutional provision is not restrictive, and that the legislature may allow any number of justices of the peace to a civil district that it may see proper, in excess of two to country districts, and three for districts including county towns; but we conceive this to be an erroneous view, and cannot yield our assent to it. We are of the opinion that the provision was clearly intended to be restrictive. The language of the constitution is: "There shall be two

justices of the peace  .  .  .  elected in each district by the qualified voters therein, except districts including county towns, which shall elect three justices." Const. art. 6, section 15. The only additional power which it was intended the legislature should exercise in respect of the number of these officers who might be allowed in a civil district is found in the last clause of the section: "The legislature shall have power to provide for the appointment of an additional number of justices of the peace in incorporated towns." The maxim, *"Expressio unius exclusio alterius,"* controls the construction in such a case.

It is true that the views above expressed in respect of the intimate and organic relations existing between the justices of the peace and the civil districts of the county, and between the justices of the peace and the incorporated towns which elect them, lead to a different conclusion from that reached in *Cross and Mercer, Ex parte,* supra. We have examined with much care the reasoning of that case, and are not satisfied with it. With the greatest deference to the very able and learned judge who prepared the opinion in that case, and for whose ability we entertain profound respect, we think that, having principally in his mind, and combating, the analogy attempted to be drawn between the case of the justices and that of the judges, he overlooked several elements of the question which we have stated above, and which we think are essential to its correct determination. That case is accordingly overruled.

We now pass to the question whether the legislature may control the number of civil districts by the passage of special laws.

It is insisted that counties are but arms of the State government, as municipalities, pure and simple, are, and that the legislature may act upon them by direct and special legislation, just as it can upon municipal corporations.

In *Luehrman* v. *Taxing District,* 2 Lea, 425, 433, it was held that municipal corporations were under the absolute control of the legislature, and might be abolished at any time, in its discretion. In *State* v. *Wilson,* 12 Lea, 246, it was held that the legislature might, by special act, amend the charter of a particular municipal corporation by name; that is, by an act referring to that corporation alone. In *Ballentine v. Mayor of Pulaski,* 15 Lea, 633, it was held that the charter of Pulaski might be so amended by special act as "to provide for and establish a system of free schools for all classes of children in said town, between the ages of six and twenty-one years," and so as to authorize the board "to levy and collect a tax for public school purposes upon all property within the town taxable under the laws of the State, and also upon all taxable polls and privileges," etc.

In *Williams* v. *Nashville,* 89 Tenn., 487, 15 S. W., 364, the court had under consideration a special act enlarging the territorial limits of Nashville. It was objected that the act, being a special law, fell under the inhibition

contained in the last clause of const. art. 11, section 8, that "no corporation shall be created or its power increased or diminished by special law." The court held that this clause applied only to private corporations, and not to municipal corporations.

A general law had been passed in 1883 (Acts 1883, p. 141, c. 114) prescribing a mode in which territory adjoining any municipal corporation organized under this act might be brought within the corporate limits. Nashville's city government at the time in question had been organized under that act. Sections 1601 and 1602 of the Code also prescribed the mode in which territory adjoining any municipality might be "added thereto and included in the corporate limits thereof."

It was contended that these were general laws, and that, so long as they remained upon the statute books unrepealed, there were no other means by which the corporate boundaries of any town or city could be enlarged, and that the special act in question, enlarging the boundaries of Nashville, was inhibited, because forbidden by the first clause of section 8 of the said article 11 of the constitution, which provides that "the legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land." Speaking to this subject, the court said:

"The statutes referred to are general laws in the sense that they present the same method of annexation to cit-

The Redistricting Cases.

izens and freeholders in territory to which they apply, respectively, throughout the State; but, pertaining as they do, exclusively to municipalities in their political aspect, which may always be controlled as well by special as by general legislation, they do not stand in the way of the act in question here, or render it unconstitutional. By their passage the legislature did not surrender, and could not have surrendered, its powers and obligations to enlarge or diminish the corporate limits of any town or city when the public exigency demands that it should be done. Incorporated towns and cities are but arms or instrumentalities of the State government—creatures of the legislature, and subject to its control at will. It may establish and abolish at pleasure. *Luehrman* v. *Taxing District*, 2 Lea, 433; *State* v. *Waggoner*, 88 Tenn., 293, 12 S. W. 721; Cooley, Const. Lim., 230, 231.

"To hold that the legislature could not enlarge the corporate limits by an act passed for that purpose would be to deny that it could create or abolish, for the greater includes the lesser, in law as in mathematics."

"Again, the act complained of is not inconsistent with the general laws of the land, because by these laws, the power to create or abolish, enlarge or diminish, municipalities, is reposed in the legislature." *Williams* v. *Nashville*, 89 Tenn., 491, 15 S. W., 365.

Yet municipal corporations are not wholly free from the operation of article 11, section 8, of the constitution. In *City of Memphis* v. *Fisher*, 9 Baxt., 239, a law

was held void, as being partial, which undertook to
authorize municipal corporations of 35,000 inhabitants,
or more to institute suits, either at law or in equity, in
any of the State courts, without giving bond for costs,
and also to prosecute appeals, writs of error, attach-
ments, injunctions, etc., without giving security for
costs.   The court, in support of this holding, said:
"While municipal corporations are in some sense public
bodies having powers conferred on them appertaining
to sovereignty, such as the power to levy and collect
taxes, yet, in another aspect, as when they become
suitors or are sued in courts, they stand as individuals.
In this latter view, municipal corporations must be gov-
erned by the general law, and can have no 'general law
suspended for their benefit, nor any law passed for their
benefit inconsistent with the general law of the land.'
Article 11, section 8, const. Tenn."

In *Hatcher and Lea* v. *State*, 12 Lea, 368, an act was
held void, as being partial, which so amended chapter
23, Acts 1877—the "four-mile law"—as to make the sale
of liquors unlawful only in municipal corporations or-
ganized under chapter 127, Acts 1881, allowing sales to
be made in all other municipalities.   In stating the
reason for the decision, the court said:   "The ground
on which the act of 1877 was held to be a law of the
land, and therefore constitutional, was that the act ex-
tended to and embraced all persons who were or might
come into the like situation and circumstances, by
which, we take it, was meant to all the incorporated

---

---

towns of the State. . . . But that principle does. not cover the amendment now before us. This is not a law governing all of the municipalities of the State, but only such as are organized under the act of 1881. . . . It would be as well to say it shall be lawful to sell liquors in all counties of the State except those organized since the constitution of 1870, or in any one of the original civil districts of the county, but, as to all newly laid off civil districts in the various counties of the State, that sale shall be prohibited. This is beyond the competency of the legislature to do, is a partial and not a general law in any sense of the word, and therefore not a law of the land, under the constitution."

In *Williams* v. *Taxing District*, 16 Lea, 537, 538, Cooper, J., harmonizing the two classes of cases, said: "It is very true that a provision of a municipal charter which undertakes to make a law for or in regard to that municipality different from the general law, or to withdraw from the operation of a general law, applicable to all municipal corporations, a particular corporation, or class of such corporations, would be obnoxious to the clause of the constitution last cited, because not the law of the land. *Mayor of Alexandria* v. *Dearmon,* 2 Sneed, 104; *Hatcher* v. *State*, 12 Lea, 368. But the particular franchises or rights granted to municipal corporations have never been held to fall within the prohibitions of article 11, section 8. For such franchises are extended to any member of the community who may become a member of the corporation. And be-

sides, such a construction of that provision of the constitution would deprive the legislature of the power to make exceptional provisions for particular municipalities or classes of municipalities." When this is read in connection with the language quoted supra from *Williams* v. *Nashville*, 89 Tenn., 491, 15 S. W., 364, a true harmony between the two classes of cases—those holding that municipal corporations are not subject to constitution, article 11, section 8, and those holding that they are subject to it—seems to be attained.

The question now to be determined is, how far are counties controlled by the analogy furnished by municipal corporations?

In the first place, it should be premised that one reason given for the plenary power of the legislature over municipal corporations—the power to create and destroy—does not exist in the case of counties. The legislature can create a county, but it cannot destroy one, without the consent of the people, composing such county. *James County* v. *Hamilton County*, 89 Tenn., 237, 14 S. W., 601.

On turning to the authorities, we find, as in respect of municipal corporations, two lines of decisions—one holding that article 11, section 8, of the constitution, applies to legislation affecting counties; and the other, that it does not. An examination of these cases will disclose the reasons upon which they rest.

The cases which hold that the section above referred to does apply are *State* v. *Burnett*, 6 Heisk., 188, 189;

*Sutton* v. *State,* 96 Tenn., 696, 36 S. W., 697, 33 L. R. A., 589; *Woodard* v. *Brien,* 14 Lea, 520; *Burkholtz* v. *State,* 16 Lea, 71; *Mayor* v. *Dearmon,* 2 Sneed, 119; *Weaver* v. *Davidson County,* 104 Tenn., 315, 328, *et seq.,* 59 S. W., 1105; *Pope* v. *Phifer,* 3 Heisk., 695, 698, 701- 704. Those cases which hold that the legislature may pass special acts in favor of counties notwithstanding article 11, section 8, and article 1, section 8, are *Moore* v. *State,* 5 Sneed, 510; *State* v. *Leonard,* 86 Tenn., 487, 7 S. W., 453; *State* v. *Maloney,* 92 Tenn., 68, 20 S. W., 419; *State* v. *Nine Justices,* 90 Tenn., 726, 18 S. W., 393; *Lauderdale County* v. *Fargason,* 7 Lea, 153 (overruling *Wallace* v. *County,* 3 Shannon's Cas., 553); and *Burnett* v. *Maloney,* 97 Tenn., 697, 702, 703, 37 S. W., 689, 34 L. R. A., 541.

We have arranged the foregoing cases in their logical order, rather than in the order of time in which the opinions were delivered and published.

In *State* v. *Burnett,* an act was held unconstitutional, as being partial, because it remitted to the citizens of Roane county, alone, the taxes collected for a certain year. The court said: "The general law appropriates the taxes collected in 1864 in the various counties of the State to the general purposes of the government, as State revenue. This act suspends this general law as to Roane county, and, for the benefit of the individuals who paid those taxes in that county, directs them to be refunded to them. In other words, the act undertakes

111 Tenn—18

to donate to certain individuals in Roane county, out of the treasury of the State, the several amounts paid by them into the treasury in 1864, but confers no such benefit on the other individuals in other counties of the State who had made like payments into the treasury. The statement of the proposition exposes its unconstitutionality, without further remark." This case was commented upon and approved in *Demoville & Co.* v. *Davidson County,* 87 Tenn., 221, 222, 10 S. W., 353, and again it was approved in *Sutton* v. *State,* 96 Tenn., 703, 36 S. W., 697, 33 L. R. A., 589.

In *Sutton* v. *State,* an act forbidding the owners of live stock in certain counties (designated by reference to a certain population under the census of 1890) to allow said live stock to run at large, under penalty of suffering a lien upon the animals for damage done, and, in addition thereto, suffering a fine, was held to be unconstitutional, because in violation of article 1, section 8, of the constitution, and also in violation of article 11, section 8. The court said: "The act violates section 8 of article 1 of the constitution, by imposing the burden of a fine and a lien upon citizens of some counties, and not upon like citizens in other counties that are or may be in the like situation and circumstances; and it violates the first clause of section 8, article 11, of the constitution, by conferring the advantage of a penal law and a property lien upon citizens of some counties, which cannot, by the same law, be extended to like citizens of other counties that are or may be in

like situation and circumstances." 96 Tenn., 705, 706, 36 S. W., 699, 33 L. R. A., 589.

In *Woodard* v. *Brien,* a law was held to be in violation of article 11, section 8, which made provisions for the citizens of Davidson and Shelby counties, in respect of judgment liens, different from those obtaining in the other counties of the State. The reasons are given on pages 523 and 524 of the report (14 Lea), and are substantially the same as those mentioned under the case just referred to.

In *Burkholtz* v. *State,* an act was held to be in violation of article 11, section 8, which allowed owners of race tracks to bet on races, sell pools, etc., on races run on their tracks, or on races run out of the State, provided the bets were made, etc., in the county in which the tracks lay—two counties (by a population test) being excluded therefrom; that is, Shelby and Davidson, or (the construction being doubtful) all of the other counties except Shelby and Davidson.

In *Mayor* v. *Dearmon,* the act passed upon by the court was chapter 111, section 10, page 171, Acts 1847-48. This act made it the duty of the sheriff of De Kalb county to hold the election for town officers, aldermen, etc., on the second Monday of February of each and every year; and, for failure to hold said election, it provided that the sheriff should forfeit and pay the sum of $50. Speaking to this statute, the court said: "There are more than seventy sheriffs in the State. This act of assembly prescribes a penalty against the sheriff of

De Kalb, or deprives him of his property, for not performing a certain duty. To make this legislation the law of the land, it would have to be applied to all other sheriffs in the State of whom the like duties are required. The act, then, does not apply to and affect all persons or officers who are or may be in the same situation and circumstances, and is therefore partial and limited in its operation, and consequently not the law of the land in the sense of the constitution."

In *Weaver* v. *Davidson County,* the question arose in respect of the salaries of certain county officers. By the second section of the act there under examination, the counties of the State were divided into four classes, and the salaries were graded according to these classes among the several county officers. By section 8 of that act there was a restriction placed upon the number of deputies to be allowed to the several county officers in counties of the first class, and in counties of the third class, and also a restriction upon the salaries to be allowed the officers in these two classes. In counties of the second class, however, there was no restriction whatever as to the number of deputies, or as to the amount of the salaries to be allowed the deputies, except the uncontrolled discretion of the county court. Knox and Hamilton were the only counties in the second class.

Again, while the number of deputies and the amount of the salaries in the first, third, and fourth classes of counties, as fixed by section 2 of the act, and in the first and third, as by section 8, were regulated and

graded according to the population of the respective classes of counties, no such basis of grading was fixed by the act as to the second class.   The county court in the counties of the second class (Knox and Hamilton) could, under the act, give more deputies with greater salaries than could be fixed in counties of the first class, which had nearly double the population.

On account of these partial provisions, no reason being apparent for the distinction made, it was held that the act was unconstitutional, as being in violation of article 11, section 8.

In *Pope* v. *Phifer,* an act which undertook to displace, in certain counties named, the quarterly county court, and to substitute therefor a board of three commissioners, was held unconstitutional, on the ground that the county court, being a constitutional court, could not be abolished, and apparently because also in violation of article 1, section 8, and of article 11, section 8.

We now turn to the second class of cases above referred to.   In *Moore* v. *State* the court had under consideration an act of the 18th of February, 1858 (chapter 38, page 46, Acts 1857-58), which established the office of county judge for the counties of Davidson, Shelby, Knox, Montgomery, and Williamson.   This act was attacked as being in violation of article 11, section 7, of the constitution of 1834.   This section is identical with section 8 of article 11 of the constitution of 1870, except the last clause (that concerning the creation of corporations), which has no bearing upon the phase of

the question which we have under examination in the
present inquiry. The court said: "We think the act
is not obnoxious to this objection. The policy of mar-
ring the uniformity and symmetry of a general system
by the establishment of these local courts may well be
questioned, but that the power to do so abides in the
legislature, we cannot doubt. They have exercised it in
establishing a criminal as well as common law and
chancery court at Memphis, at Nashville a criminal
court, a common-law court in Chattanooga, and perhaps
in other instances. The constitutionality of these acts
has never, so far as we are aware, been questioned, al-
though they have exercised jurisdiction of the lives and
fortunes of individuals. Such acts are not partial in
the sense of the clause referred to. The office created
is open to all the citizens equally, in the prescribed
limits, and the jurisdiction conferred operates upon all
alike who may fall within its range. That provision,
it is presumed, only has reference to acts conferring
privileges and benefits, affecting rights, or imposing
penalties. It is with the legislature to determine how
many and what kind of courts are required for the ad-
ministration of justice, and what shall be the character
and limits of the jurisdiction of each. They may like-
wise christen the presiding officer with any name or title
they may consider most appropriate. They might
have denominated the officer in question a chairman, a
chief squire, a president, or presiding officer, as well as
a judge. This could not affect the validity of the act

The Redistricting Cases.

by which he is brought into existence, or the extent of his jurisdiction."

In *State* v. *Leonard* and in *State* v. *Maloney*, the power of the legislature to create a county judge for a given county by a special act is rested upon article 6, section 1, of the constitution of 1870. Upon this subject it is said in the first of these cases (page 487, 86 Tenn., and page 454, 7 S. W.) : "In the passage of this law" [an act creating a county judge for Marshall county] "the legislature acted under its constitutional authority to create originally, or by amendment of an existing court system, an inferior court." That section reads: "The judicial power of this State shall be vested in one supreme court, and in such circuit, chancery, and other inferior courts, as the legislature shall from time to time, ordain and establish; in the judges thereof, and in justices of the peace. The legislature may also vest such jurisdiction in corporation courts as may be deemed necessary. Courts to be holden by justices of the peace may also be established."

Article 6, section 1, of the constitution of 1834, which was in existence when *Moore* v. *State* was decided, was as follows: "The judicial power of this State shall be vested in one supreme court; and such inferior courts as the legislature shall, from time to time, ordain and establish, and the judges thereof; and in justices of the peace. The legislature may also vest such jurisdiction as may be deemed necessary in corporation courts."

In *State* v. *Nine Justices*, an act was under consider-

ation which gave Chattanooga certain additional justices of the peace. It was insisted that this act was in violation of article 11, section 8, of the constitution. In disposing of this objection the court referred to the last clause of article 6, section 15, of the constitution of 1870, which reads as follows: "The legislature shall have power to provide for the appointment of an additional number of justices of the peace in incorporated towns."

After quoting this clause, the opinion (page 726, 90 Tenn., and page 393, 18 S. W.) proceeds: "This court is unanimously of the opinion that any special act of the legislature giving to any incorporated town power to elect any definite number of justices of the peace would be within the saving of this last-mentioned clause, because it is a subject upon which the legislature has the express power to pass special laws." On first impression this would seem to be an authority applicable to municipal corporations alone, and not to counties; but, inasmuch as such justices of the peace are county officers, it is apparent that it has a direct bearing upon the power of the legislature to legislate by special act for the benefit of the counties.

In *Wallace* v. *County Court,* 3 Shannon's Cas., 442, it was held that the legislature could not empower counties, by special laws, to make subscriptions in favor of railway enterprises; but in *Lauderdale County* v. *Fargason,* supra, this case was expressly overruled. In the *Fargason Case* it was not denied that counties were, in gen-

eral, under the protection of the constitution as against partial laws, but the court placed its conclusion on the ground that the power was given by article 2, section 29, of the constitution of 1834; the subscription of Lauderdale county having been made while that constitution was in force.   The section referred to reads as follows:   "The general assembly shall have power to authorize the several counties and incorporated towns, in the State, to impose taxes for county and corporation purposes, respectively, in such manner as shall be prescribed by law," etc.

· The argument in the opinion is based on three lines of thought:   First, that the power had long been recognized and unquestioned; second, that the power conferred was to be exercised in favor of both counties and incorporated towns, and that "it has never been contended by anyone that a municipal corporation could not be authorized by a special law to make contracts, and to levy taxes to meet them; and, third, that the use of the word "several" indicated that the power was to be exercised for the benefit of individual counties and incorporated towns.

In *Burnett* v. *Maloney,* the court had under consideration an act authorizing the county court of Knox county to issue the bonds of said county for building a bridge across the Tennessee river at the south end of Gay street, Knoxville.

Among other objections raised against the act in that

case, one was that the act was repugnant to article 11, section 8, of the constitution, and therefore void.

This general objection was divided by the court into two parts, as follows: "Is the act in question obnoxious to the constitutional objections which plaintiffs make to it? These objections are, first, that it was passed for the benefit of Knox county alone, granting to it a right or power not extending to any other county; and, secondly, that it is an effort to increase the powers of this county by special law, and it is assumed that they are sustained by section 8 of article 11 of our constitution." After quoting the provisions of the constitution bearing upon the subject, the court disposed of the objections as follows: "The objection here raised has been set at rest by this court, and against the contention of the plaintiffs. In the case of *Lauderdale County* v. *Fargason,* 7 Lea, 153, it was considered and determined, the court saying: 'It has never been contended by anyone that a municipal corporation could not be authorized by a special law to make contracts, and levy taxes to meet them.' So it was held in that case that certain acts of the legislature, providing that the couny court of any county through which the line of the Mississippi River Railroad was proposed to be run might, under certain conditions, subscribe to the capital stock of the company, were not amenable to section 7 of article 11 of the constitution of 1834. This decision has never been disturbed by any subsequent holding. On the contrary, if not by direct reference, yet by necessary

implication, it was approved in the case of *Williams* v. *Nashville,* 89 Tenn., 487 [15 S. W., 364], arising under the present constitution.

"The second of these objections going to the unconstitutionality of this act, is disposed of in *State* v. *Wilson,* 12 Lea, 246; *Ballentine* v. *Mayor of Pulaski,* 15 Lea, 633; and *Williams* v. *Nashville,* supra."

From this examination it is apparent that *State* v. *Burnett, Sutton* v. *State, Woodard* v. *Brien,* and *Burkholtz* v. *State* may all be ranged under the principle that no benefit shall be conferred or no burden imposed upon the citizens of any given county, which by the same act is not conferred upon or imposed upon all of the citizens of all of the other counties in the State who may be able to bring themselves, or may be brought, within the terms of the act conferring the benefit or imposing the burden, and that *Mayor* v. *Dearmon* and *Weaver* v. *Davidson County* fall under the same principle; substituting the "same class of officers" for the word "citizens" in the preceding statement. It is apparent, therefore, that these cases do not oppose the hypothesis that the legislature may pass special laws for the regulation of individual counties, by name, as arms of the State government, or subordinate political entities, as distinguished from the personal relations of their several citizens.

It is equally obvious that while *Moore* v. *State, State* v. *Leonard, State* v. *Maloney, State* v. *Nine Justices, Lauderdale County* v. *Fargason,* and *Burnett* v. *Ma-*

*loney* (as to its first point) do not necessarily establish the hypothesis, inasmuch as they rest upon special clauses of the constitution which were held to confer or permit the power of special legislation in respect of matters falling thereunder, yet they furnish very useful analogies that point to the conclusion indicated by the hypothesis just referred to.

It is equally apparent that *Pope* v. *Phifer* seems to stand squarely across the way, and to hold, in substance, that the counties cannot be regulated, even as governmental agencies, by special laws. On the contrary, the determination of the second point in *Burnett* v. *Maloney* seems to have been based upon the principle that the counties stand as arms of the State government, just as do municipal corporations, and may be regulated in the same way by special laws.

The logical result, however, of the decision upon the second point in *Pope* v. *Phifer,* if extended to the farthest boundary of the doctrine taught, consistent with the language used, would deny to the legislature the right to deal with the counties by special laws, whether considered in their relation of governmental agencies, or in respect of those sections of the constitution which have, in the several cases referred to supra, been construed to permit the passage of special laws; and so that case would be brought into conflict with those cases, nearly all of which are more recent, and all of them of undoubted authority. Again, the reasoning in *Pope* v. *Phifer,* in determining what we have denominated its

The Redistricting Cases.

second point, is perhaps too broad, if given the full scope which the generality of the language used would seem to indicate, since, in settling a question of constitutional law, it is not, in truth, a matter of observation or remark as to the fidelity of the several members of the legislature in representing their separate constituencies, or of their recreancy to duty in vexing with unwholesome and oppressive laws the constituencies of other members, but, on the contrary, it is always a question of power, under a true construction of the constitution.

So *Pope* v. *Phifer* must be considered in respect of the question before the court in that case. It was there determined that the quarterly county court was a constitutional court, and could not be displaced by a board of commissioners.

It was further held that, if a board of commissioners could be lawfully substituted for the quarterly court in any county, it would have to be so substituted in all; that is, that so radical a change in the fundamental organization of the counties could not be made, if at all, except by a general law. The first, however, having been determined against the act—that is, that there could be no such substitution at all—the second point became a mere abstraction.

Therefore that case, as to the point referred to, offers no obstacle to the determination of the present one upon what we deem to be the true ground.

The question, of course, turns upon the construction which shall be given to section 15 of article 6 of the

constitution. That section has been reproduced, in sub-
stance, in a preceding part of this opinion, to which we
refer.

As we have already pointed out, it has been held
(*State* v. *Nine Justices,* supra) that the last provision
in that section may be enforced by special laws. What
is there, in sound reason, to prevent the first provision
from being so enforced?

It is said that the power of the legislature over the
subject was exhausted when the sections of the Code
(sections 77 to 81 of the Code of 1858; Shannon's Code,
sections 95-99) were enacted. But it is a principle of
constitutional law, recognized in this State, that the
power of the legislature over all matters of legislation
within its domain is never exhausted, and that the only
question in any case is, has it been constitutionally ex-
ercised? *Ballentine* v. *Mayor of Pulaski,* 15 Lea, 639;
*Leeper* v. *State,* 103 Tenn., 502, 53 S. W., 962, 48 L. R.
A., 167. Moreover, the sections of the Code referred to
were enacted some in 1835, and the others when the
Code of 1858 went into effect; hence all of them before
the making of the constitution of 1870. If the people
of the State, acting in their sovereign capacity, when
they made that constitution, deemed that the sections
of the Code referred to contained the final word upon
that subject, then the provision contained in the first
sentence of section 15 of article 6 was an idle pronounce-
ment. Contrariwise, if that provision is a valid one,

which no one can doubt, then the sections of the Code referred to can raise no obstacle to its enforcement.

It is said that to uphold laws such as these which we have under examination in the case before the court would be to sanction special legislation, acts suspending a general law for the purpose of conferring a benefit or imposing a burden upon a few counties to the exclusion of the other counties of the State, and therefore acts in violation of the constitution. The rule is general, of course, that the legislature can pass no special act. But we have seen that there are exceptions to this rule—for example, in respect of municipalities, in certain aspects above considered; likewise counties, in certain aspects to which we have already referred. We have seen that special laws may be passed for the purpose of empowering counties to make contracts and impose taxes for the purpose of making internal improvements, and for other county purposes; that special acts may be passed for the benefit of individual counties, creating county judges therefor; also that special acts may be passed for the benefit of individual counties, authorizing the municipal corporations therein to elect, for the benefit of the county, justices of the peace, additional to the number provided in section 15 of article 6 for the county, as measured by the number of its civil districts. Each of these legislative instances except the last, as respects their several classes, arose under a different provision of the constitution, but all of them have a common characteristic—they pertain to the coun-

ties as governmental agencies, as arms of the State government. And one of them—that last cited—is a part of the very section we have under examination.

Is the laying off of the counties into civil districts any less a matter of governmental control than the instances to which we have referred? Nay, far more. As we have already pointed out, the fundamental unit of our system is the county; the county government is, in the main, vested in the county court; the county court is composed of justices of the peace; the number of those justices, and hence the governing force of the county, is determined chiefly, under section 15, of article 6, by the number of civil districts in the county. From these considerations it is obvious that the regulation of the number of justices of the peace in the counties is, in the highest sense, a governmental function. If the regulation of the number of the civil districts in the counties be, then, a governmental function, in the sense that the counties are thereby acted upon as governmental agencies, or arms of the State government, as contradistinguished from the regulation of the affairs of the citizens themselves, or of the duties of officers or classes of officers, as, indeed, it seems, there can be no doubt, then it follows, as a necessary consequence, that special acts may be passed for the purpose of effecting this regulation.

It is said that, under this view of the matter, a portion of the counties will be operating, as to the number of justices, under the special laws made for their benefit,

while the others will be operating under the sections of the Code which we have referred to, and have also cited. This is true, but what real significance has this fact? Every county not yet affected by a special act holds the powers it exercises, in this respect, at the sufferance of the legislature, and that power may be withdrawn whenever the legislature may deem it best for the public good. Besides, it is of the very essence of power existing in the legislature, such as we are now considering, that it cannot be waived. This phase of the matter was considered in *Williams* v. *Nashville,* 89 Tenn., 487, 15 S. W., 364, in a passage which we have already quoted, in respect of the power of the legislature over municipal corporations. It was there said, in respect of certain general laws upon the subject of the annexation of outlying territory to cities, and upon the point made, that their existence was a barrier to special legislation upon the same subject in behalf of a single city: "Pertaining, as they do [the general laws referred to], exclusively to municipalities in their political aspect, which may always be controlled as well by special as by general legislation, they do not stand in the way of the act in question here, or render it unconstitutional. By their passage the legislature did not surrender, and could not have surrendered, its powers and obligations to enlarge or diminish the corporate limits of any town or city when the public exigency demanded that it should be done."

It is urged that the principle of local self-government is violated by these acts. This is a mistaken view. As we have already said: The counties are our unit of government, and they cannot be abolished by the legislature; nor can the legislature do away with the offices of all the justices of the peace, before the expiration of their terms, by abolishing all of the civil districts. There must always be, under the very terms of the constitution, a division into civil districts, and those already in existence at the date of any legislative action must continue in existence until there is a new division, not a mere effacement. Their number may be increased up to the constitutional limit set forth in section 15 of article 6, or they may be diminished, but there must always be civil districts. Moreover, there is not one of the various county offices provided for in the constitution, which we have referred to in a former portion of this opinion, that can be abolished by the legislature. We do not think, therefore, that there is any real impeachment of the principle of local self-government, in the exercise by the legislature of the power to redistrict a county, and so to increase or diminish the membership of its local legislature. Furthermore, it is a matter of comparatively recent history that the legislature has constitutionally resumed the power of local taxation and other powers previously vested in one of the great municipalities of the State. We refer to the Memphis cases. See the discussion of this subject by Cooper, J., in *Luehrman* v. *Taxing District*, 2 Lea, 425, 436-439.

See, also, the discussion of the same subject, in respect
of our school system, by one of the present members of
the court—Wilkes, J., in the case of *Leeper* v. *State,* 103
Tenn., 527-533, 53 S. W., 962, 48 L. R. A., 167.

Again, it is said that section 15 of article 6 uses the
word "direct," and it is argued from this that the mean-
ing of the section is that the legislature may have the
counties redistricted, through the agency of the county
court, or some board or commission appointed for the
purpose, but that it cannot deal with the subject by its
own immediate action.   We do not doubt that the peo-
ple of the State, in framing the constitution, could
have so limited the power of the legislature in the
matter of redistricting the counties as to provide that
the power should be exercised only in the manner just
stated.   But such a limitation ought not to be imposed
by doubtful construction, nor, indeed, by anything short
of a necessary implication from the terms used in the
constitution as framed, in view of the settled principle
(*Pope* v. *Phifer,* 3 Heisk., 686; *Lauderdale County* v.
*Fargason,* 7 Lea, 153, 154; *Davis* v. *State,* 3 Lea, 376; *De
Moville* v. *Davidson County,* 87 Tenn., 220, 10 S. W.,
353; *Stratton Claimants* v. *Morris Claimants,* 89 Tenn.,
497, 15 S. W., 87, 12 L. R. A., 70; *Henley* v. *State,* 98
Tenn., 665, 681, 41 S. W., 352, 1104, 39 L. R. A., 126;
*Dayton* v. *Barton,* 103 Tenn., 604, 53 S. W., 970) that
the legislature of the State has all powers of legislation,
except in so far as it may be restrained by the consti-
tution of the State, or of the United States, expressly

or by necessary implication. We do not find any such necessary implication in the word "direct." Usually, the power to direct a thing to be done necessarily implies the power to do the act one's self, on the principle that the greater power includes the less. Such subdivision of a county could, no doubt, be more conveniently made by a local board or commission, but we cannot say that this method is essential. If the legislature has before it data which it regards as trustworthy and sufficiently full to enable it to redistrict a county, we see no reason, under the constitution, why it may not itself undertake the work.

For the reasons stated, our conclusion is that the acts under examination are constitutional, in so far as they are acts redistricting the counties, and in so far as they provide that the civil districts shall not be increased or diminished in number in the future except by acts of the general assembly. The result of this holding, as already stated, is that the offices of the several justices of the peace elected by the civil districts so abolished must fall with the said civil districts. We do not pass upon the constitutionality of those sections of the several acts which purport to operate directly upon the offices, and so abolish them. The sections referred to are wholly immaterial, inasmuch as we have held that the redistricting of the counties was constitutional, and that the effect of this was to deprive of their offices the justices of the peace involved.

The Redistricting Cases.

A decree will be entered in the several cases in accordance with this opinion, appropriate to the special form of action adopted in the several cases, and also adjudging costs in accordance therewith.